JOSEPH R. HARRIS, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Harris v. Commissioner
Docket No. 4153-87
United States Tax Court
T.C. Memo 1990-80; 1990 Tax Ct. Memo LEXIS 80; 58 T.C.M. (CCH) 1441; T.C.M. (RIA) 90080; February 20, 1990
Daniel Goldberg, Allen Schwait, and Lana Wood, for the petitioner. Robert Miller, for the respondent. WELLS
MEMORANDUM FINDINGS OF FACT AND OPINION WELLS, Judge: Respondent determined deficiencies in the income tax of petitioner Joseph R. Harris as follows: Year
Amount
1979
$ 1,244.00  1981
648,441.36
1982
1,960.00
Respondent also determined that petitioner was liable for additions to tax under section 6653(a) [1] and for increased interest under section 6621(c). The additions to tax under section 6653(a) have been conceded by respondent. *82 The instant case involves the allowability of deductions arising from petitioner's limited partnership interest in the Research One Limited Partnership (the "Partnership" ), [2] and is the controlling case for the allowability of losses from the Partnership claimed by persons holding interests in the Partnership during 1981 and 1982. After concessions, the issues for our decision are: (1) whether certain research and development expenditures of the Partnership were made "in connection with a trade or business" of the Partnership, (2) whether certain administrative expenses and fees of the Partnership were properly deductible or amortizable under sections 162, 212, or 709(b), and (3) whether the increased interest provided by section 6621(c) applies to the instant case. FINDINGS OF FACT Many of the facts have been stipulated. The stipulations of fact and accompanying *83 exhibits are incorporated herein by this reference. At the time of filing his petition in the instant case, petitioner Joseph R. Harris was a resident of Houston, Texas. Petitioner was an 18.62 percent limited partner in the Partnership during the years in issue. Ferro Boat Builders, Inc. ("Ferro") was founded in 1971 by Mr. Jake Bauer, an expert in the area of cementitious composite materials. Between 1972 and 1981, Ferro was engaged in the manufacture of "ferrocement" yachts and floating docks for a variety of private and corporate clients. In addition to manufacturing such vessels, Ferro engaged in research with respect to the fundamental physical and chemical structure of cement and was retained for consulting work by the U.S. Navy. During 1980, the Boeing Vertol Company (hereinafter referred to as "Boeing") hired Ferro to perform a feasibility study involving the use of cementitious composites as a "tooling" material for the aerospace industry. Aerospace "tools" are molds which are used to manufacture aerospace parts; the raw materials for the parts are placed in the tools and are then subjected to extremely high temperatures. At the time, aerospace tools were generally *84 made of aluminum and nickel, which were both expensive and difficult to use. Ferro was also hired by Burlington Glass Fabrics Company (hereinafter referred to as "Burlington") at about the same time to study glass-cement compatibility and the feasibility of using glass-reinforced cement as a sturdier substitute for wood in the fabrication of shipping pallets. The results of Ferro's feasibility studies for Boeing and Burlington were positive, and it appeared that further research and development in these areas could result in products of tremendous commercial value. Although the product of the research performed for Boeing was initially the property of Boeing, Boeing assigned such property back to Ferro because of funding cutbacks that prevented Boeing from continuing to finance the research for its own account. By the fall of 1981, the principal stockholders of Ferro, Mr. Bauer and Mr. Howard Leith (who had joined Ferro in 1976), believed that substantial profits could be achieved through a continuation and expansion of the research initiated under the ambit of the Boeing and Burlington studies. Both Boeing and Burlington had indicated a willingness to purchase the hoped-for *85 end-products of such research; Burlington also had an interest in supplying glass fabrics to be used in the manufacture of glass-reinforced cement products. As Ferro's yacht manufacturing business had suffered severe financial losses, however, Ferro lacked the resources necessary to initiate further research on these projects. Mr. Bauer and Mr. Leith thus decided to pursue outside sources of financing for such research, and, in an effort to obtain a balance sheet "clean" of Ferro's debts, formed a new research company, which they named CemCom Research Associates, Inc. ("CemCom") after the "cementitious composite" products to be developed. CemCom was incorporated in Maryland on October 2, 1981, and the technical know-how developed by Ferro in the areas to be pursued by CemCom (the "Old Technology") was transferred from Ferro to CemCom for $ 125,000 on December 15, 1981. Shortly after CemCom's incorporation, Mr. Michael Savage, an attorney for Mr. Bauer and Mr. Leith (and a minority stockholder of CemCom), contacted Mr. Dennis Townsend, an investment advisor and the President and majority stockholder of Townsend & Co., Inc., a company involved in the structuring and management of *86 tax-sheltered real estate and oil and gas investments. Mr. Savage, who was familiar with some of the ventures organized by Mr. Townsend, told Mr. Townsend that his clients had a research program involving technology that appeared very promising but that they needed someone to put money into the venture. Mr. Townsend subsequently met with Mr. Bauer and Mr. Leith, who told Mr. Townsend about the research in which they were engaged and presented him with a written "Confidential Business Plan" detailing CemCom's research goals and projected income. Mr. Townsend also spoke directly with scientific personnel about the likelihood of success of the CemCom research projects and was told that the likelihood was over 75 percent. In addition to meeting with the CemCom personnel, Mr. Townsend met directly with personnel from Boeing and Burlington to verify the information supplied to him by Mr. Bauer and Mr. Leith. Both Boeing and Burlington confirmed the enormous market potential of the products to be developed by CemCom as well as their optimism about CemCom's prospects for success. Burlington also supplied Mr. Townsend with a letter pledging various types of support for the CemCom pallet *87 project, including: laboratory support, the supplying of a reasonable amount of glass fabrics at no charge, a commitment to purchase pallets from CemCom if certain specifications were met, and an informal agreement to introduce CemCom's products to other potential end-users with which Burlington did business. Based on his investigations, Mr. Townsend concluded that a venture with CemCom had a potential for profit which justified its risks; he also believed that the tax benefits available to investors in such a venture would provide a protective offset to its risks. It was decided that the venture would be structured by forming a limited partnership on behalf of which CemCom would perform its research and development activities. Mr. Townsend negotiated three agreements with CemCom during the fall of 1981 -- a Research and Development Agreement (the "R&D Agreement"), a Technology Transfer Agreement (the "Transfer Agreement"), and a Stock Option Agreement. These agreements named as the contracting parties CemCom and the Partnership, of which Mr. Townsend and Townsend & Co. would serve as general partners. The three agreements with CemCom, and the partnership agreement for the Partnership *88 (the "Partnership Agreement"), were set forth in the Confidential Private Placement Memorandum offering units in the Partnership (the "Private Placement Memorandum"), which was dated November 30, 1981. The Partnership was formed and the three agreements were executed on December 31, 1981, after the sale of the requisite number of units in the Partnership to investors including petitioner. According to the Private Placement Memorandum, the Partnership was formed "to invest" in the research and development of cementitious composite materials technology by contracting for such work with CemCom. The Private Placement Memorandum stated that the Partnership intended to utilize over 95 percent of its funds to pay the amounts due under the R&D Agreement and would maintain only nominal funds for Partnership purposes prior to any sale of the technology to be developed. The Private Placement Memorandum also cautioned investors of the general partners' inexperience with respect to the research and development activities to be undertaken and noted that the general partners would "devote only a limited amount of their time to the affairs of the Partnership." Under the R&D Agreement, CemCom *89 agreed to perform designated research activities on behalf of the Partnership; all property rights arising from such research activities were to belong solely and exclusively to the Partnership, subject to CemCom's option to acquire such property, discussed below. The specific research projects to be performed by CemCom under the R&D Agreement represented a continuation and expansion of Ferro's prior research efforts on the aerospace tooling project and the glass-reinforced cement pallet project, and the timing and description of such projects were taken from the CemCom Confidential Business Plan which had been prepared for Mr. Townsend. Mr. Townsend had no prior experience involving research and development enterprises and no expertise in the cement industry prior to the fall of 1981. Under the R&D Agreement, the Partnership was required to pay CemCom a total of $ 5,050,000 for its research services. Payments were to be made in three increments, as follows: (a) $ 1,200,000 payable in cash upon execution of the R&D Agreement (i.e., on December 31, 1981), (b) $ 1,050,000 payable in cash on September 15, 1982, and (c) $ 2,800,000 plus interest at the annual rate of 12 percent on *90 the unpaid balance accruing following July 1, 1983, payable in semiannual installments between January 1, 1984, and January 1, 1992. However, in the event that there were insufficient funds in the Partnership to make the semiannual installment payments of the third increment, the R&D Agreement provided that the Partnership would not be considered in default until January 1, 1991. On its 1981 Federal income tax return (Form 1065), the Partnership, using the accrual method of accounting, elected to deduct the $ 5,050,000 payable to CemCom under the R&D Agreement as a research and development expense under section 174(a)(1). The first two increments payable to CemCom under the R&D Agreement were to be funded by matching capital contributions to the Partnership by the limited partners. Although each limited partner was also personally liable under the Partnership Agreement and the R&D Agreement for his allocable share of the third increment due under the R&D Agreement, the Partnership Agreement provided that contributions would be required from the limited partners in satisfaction of the third increment of $ 2,800,000 only "at the call and sole discretion of the General Partners, but *91 only to the extent Partnership Funds are inadequate" to repay such amount. The R&D Agreement provided that all work to be performed by CemCom thereunder would be performed diligently "with the manner and method of doing the same under the control of [CemCom], Partnership being interested only in the results obtained." Although the fixed amount payable to CemCom under the R&D Agreement might be inadequate to develop commercially useful technology, no provision was made for additional funding of CemCom research by the Partnership, and neither the limited nor the general partners were obligated to make any contributions to the Partnership in excess of the fixed amounts provided for under their subscription agreements. The R&D Agreement stated that all expenses payable thereunder were "intended to qualify as research and experimental expenses within the meaning of section 174" and that the President of CemCom or his designee would have the sole discretion to determine when each item of technology had developed to the state when further expenses related to such item would no longer qualify for deductibility, at which time the item would no longer be considered a part of the research *92 program under the agreement. Although all written notes and records regarding the technology developed under the R&D Agreement were to belong to the Partnership, the R&D Agreement required the Partnership to give CemCom written notice of its intention to inspect or copy such records at least two business days before doing so. To ensure that the amounts paid by the Partnership under the R&D Agreement were disbursed by CemCom in accordance with the purposes of the agreement, the agreement provided that such amounts would initially be deposited in an escrow account maintained in CemCom's name but which required the signature of Mr. Townsend or a designated employee of Townsend & Co. for withdrawal. Although Mr. Townsend reviewed and supervised CemCom's expenditures from the escrow account, he believed that CemCom could have legally required him to sign checks from the account. The R&D Agreement also provided for quarterly status reports, unaudited budgets, and financial statements to be submitted to the Partnership by CemCom; in its sole discretion the Partnership could require monthly reports as well. Mr. Townsend had insisted on the above provisions because of the poor management *93 and financial history of Ferro. CemCom agreed to indemnify the Partnership, during the term of the R&D Agreement and for one year thereafter, from any and all claims, liabilities, and losses on account of damages to persons or property arising out of performance of the R&D Agreement. CemCom also agreed to indemnify the Partnership with respect to all claims related to patent infringement, trade secrets, or other rights of third parties resulting from the Partnership's utilization of the technology developed under the R&D Agreement. Simultaneously with entering into the R&D Agreement, the Partnership and CemCom entered into the Transfer Agreement, under which CemCom was granted an option to acquire a perpetual exclusive license of the technology being developed for the Partnership under the R&D Agreement. The technology being developed was referred to in the various agreements as the "New Technology," and the Transfer Agreement stated in part that CemCom was to be the "purchaser" of the New Technology rather than an agent of the Partnership. The Transfer Agreement also provided the Partnership with a nonexclusive development license of the Old Technology to the extent necessary *94 in connection with the Partnership's performance of the R&D Agreement. In consideration of such license, the Partnership agreed to pay CemCom $ 100 annually. The option granted to CemCom under the Transfer Agreement was exercisable between June 30, 1983, and December 31, 1983, if the New Technology was patentable. If the New Technology was not patentable, the option would be exercisable "at such time as in the opinion of Partnership's Counsel, payments to the Partnership under such license will qualify for long-term capital gain treatment under the Internal Revenue Code." [3] At the time that the R&D and Transfer Agreements were entered into, it was believed that CemCom's research programs would be complete by the end of 1983 and would result in patentable technology. The R&D Agreement provided that CemCom's research engagement was to terminate upon the earlier of (1) the date of completion of the designated research tasks or (2) December 31, 1983. *95 The Transfer Agreement provided for "royalty" payments to be made by CemCom to the Partnership upon the exercise of CemCom's option. While the Transfer Agreement indicated that such royalties were generally based on a percentage of CemCom's gross sales (with such percentage ranging as high as 12.5 percent), it also provided for "minimum" royalties totalling $ 15,905,000. The due dates for the minimum royalty payments exactly coincided with the due dates of the installment payments to be made by the Partnership in satisfaction of the third increment ($ 2,800,000) due under the R&D Agreement. The following chart compares the amounts of the deferred payments to be made by the Partnership under the R&D Agreement with the minimum royalties provided by the option provision of the Transfer Agreement: Amount Payable by
Amount Payable
Partnership to CemCom
by CemCom to
Due Date
[4] (R&D Agreement) [5] Partnership (Option) 1/1/84
$ 168,000
$ 175,000  7/1/84
168,000  200,000    1/1/85
168,000  865,000    7/1/85
168,000  875,000    1/1/86
168,000  890,000    7/1/86
168,000  900,000    1/1/87
168,000  900,000    7/1/87
380,430  1,110,000  1/1/88
380,430  1,110,000  7/1/88
380,430  1,110,000  1/1/89
380,430  1,110,000  7/1/89
380,430  1,110,000  1/1/90
380,430  1,110,000  7/1/90
380,430  1,110,000  1/1/91
380,430  1,110,000  7/1/91
380,430  1,110,000  1/1/92
380,430  1,110,000  *96 The matching due dates of the above payments essentially allowed the third increment due from the Partnership under the R&D Agreement to be funded by the minimum royalties in the event of exercise of the option by CemCom. The Private Placement Memorandum cautioned investors of the possibility that they would have to pay their allocable shares of the third increment. The minimum royalties described above were, in Mr. Townsend's belief, very high in relation to market standards and, if paid by CemCom, would result in more than a three to one return (before tax benefits) to the Partnership. Additionally, if CemCom exercised its option, the Partnership would, under the Stock Option Agreement, be entitled to acquire 14 percent of CemCom's *97 stock for $ 14,000 (after the payment of $ 5,000 for the option itself), and Mr. Townsend would be entitled to acquire 5 percent of CemCom's stock for $ 5,000, such purchase prices being expected to fall well below the fair market value of the CemCom stock. If CemCom did not exercise its option to exclusively license the New Technology, the Transfer Agreement provided that CemCom, Mr. Bauer, and Mr. Leith could not engage in any business activity or further research and development involving the New or the Old Technology for a period of five years. Mr. Townsend negotiated the noncompetition clause in an effort to assure exercise of the option by CemCom. Mr. Townsend felt that the terms of the noncompetition clause provided CemCom with a tremendous incentive to license the New Technology from the Partnership, because its failure to do so would force it, and its two major shareholders, to leave the cement business. The Partnership would, however, remain liable for the $ 2.8 million deferred payment under the R&D Agreement if CemCom failed to license the New Technology. The Transfer Agreement also provided that in the event that Cemcom did not license the New Technology, CemCom *98 would be obligated to grant a nonexclusive perpetual license of the Old Technology to the Partnership for the purpose of enabling the Partnership to pursue further development and marketing of the New Technology. The royalties payable to CemCom in connection with such license would be determined by an appraiser based on the standards set forth in the regulations under section 482. The Private Placement Memorandum stated that: It is anticipated that the technology produced under the R&D Agreement will be licensed by CemCom pursuant to an option to enter into an exclusive perpetual license of the New Technology granted in the Technology Transfer Agreement * * * although CemCom is not obligated to exercise its option to license the New Technology. The economic forecasts (Schedule A) included in the Private Placement Memorandum were based on the assumption that CemCom would exercise its option and that the Partnership would receive the minimum royalties provided for under the Transfer Agreement. Although the Private Placement Memorandum indicated in several places that the Partnership maintained the right to exploit the New Technology in the event of nonexercise of the option *99 by CemCom, it contained no economic forecasts based on such eventuality and no description of how such exploitation might be accomplished. The Private Placement Memorandum indicated that the Partnership's existence would terminate on December 31, 2029, unless terminated sooner for one of several reasons, including the termination of royalty or other payments to the Partnership from the sale or licensing of the New Technology. Mr. Townsend personally told potential investors in the Partnership that, although it was not highly probable that the option would be exercised by CemCom in accordance with its original terms, it was highly probable that a perpetual exclusive license would be entered into with CemCom on renegotiated terms providing for lower minimum royalties. Mr. Townsend did, however, caution investors about their liability for an allocable share of the $ 2,800,000 deferred payment due under the R&D Agreement, which amount might be payable out of the partners' own funds in the event of nonexercise of the option by CemCom. During 1982, the performance of the research and development work provided for under the R&D Agreement comprised nearly 100 percent of CemCom's *100 activity. Mr. Townsend's role in CemCom's activities during 1982 was primarily to review CemCom progress reports and budgets and to monitor CemCom expenditures pursuant to the escrow account provision of the R&D Agreement. In late 1982, Mr. Bauer and Mr. Leith approached Mr. Townsend with a proposal for a new research venture to be funded by a second limited partnership. Mr. Townsend was unwilling to organize a second partnership absent assurance by CemCom that it would exercise its option to acquire the New Technology. In an effort to satisfy Mr. Townsend's requirements, CemCom on December 29, 1982, entered into a "First Amendment to Technology Transfer Agreement" which stated in relevant part that "[CemCom] hereby agrees that it shall exercise its option to obtain a perpetual exclusive license of the [New] Technology in accordance with the terms and conditions of the Technology Transfer Agreement." Mr. Townsend believed that such provision bound CemCom to exercise its option, and the Research Two Limited Partnership, a second Townsend venture with CemCom, was formed two days later. The original goal of CemCom's research with respect to the aerospace tooling project was to *101 produce a novel "ready-mix" cement which could be sold to users who would be able to prepare it without special expertise in the cement field. Mr. Bauer and Mr. Leith intended that CemCom would engage in research and licensing only, and would not become a manufacturer of aerospace tooling. It was expected that CemCom would sublicense all of the New Technology to others in exchange for royalties, and the terms of the option provided by the Transfer Agreement were based on that assumption. Because technical difficulties were encountered, however, a "ready-mix" was not produced in the expected time frame, and CemCom was unable to find any potential sublicensees who would agree to produce and sell the New Technology on anything other than a "best efforts" basis. Mr. Townsend participated in CemCom's meetings with potential sublicensees during 1983 primarily because he did not have respect for the business acumen of CemCom's principals and wished to help increase the likelihood of CemCom's exercise of its option. In November 1983, Mr. Savage, on behalf of CemCom , wrote a letter to Mr. Townsend which acknowledged that the time for CemCom to exercise its option was approaching and explained *102 that CemCom had failed to engage sublicensees for the New Technology who would commit to the payment of adequate minimum royalties. The letter went on to state that CemCom had decided to attempt to manufacture and sell the New Technology itself and thus could not afford to pay the minimum royalties required by the Transfer Agreement. The letter proposed revised terms for a licensing agreement based on the changed circumstances. On behalf of the Partnership, Mr. Townsend agreed to two thirty-day extensions of the time period within which CemCom could exercise its option. Negotiations between CemCom and the Partnership for a licensing agreement occurred during the extension periods. Starting in 1984, Mr. Townsend's participation in CemCom's affairs increased significantly as he assisted CemCom in its attempt to obtain outside sources of financing which would enable CemCom to make sufficient minimum royalty payments to the Partnership. Among the funding possibilities pursued by CemCom with Mr. Townsend's assistance was a private offering of CemCom stock with Wheat, First Securities serving as underwriter. Such outside avenues proved unsuccessful, and Mr. Townsend and Townsend & *103 Co. advanced over $ 900,000 to CemCom by September of 1984. In working to obtain outside financing for CemCom and in making advances of his own to CemCom, Mr. Townsend was primarily motivated by his desire to protect the limited partners of the Partnership from having to make the deferred payments under the R&D Agreement without receiving offsetting royalty payments from CemCom. Although Mr. Townsend had initially believed that the mere exercise of the option by CemCom would release the Partnership from liability for the third increment payable under the R&D Agreement, he later feared that the Partnership could be held liable for such third increment even if CemCom exercised its option but subsequently defaulted in its obligation to make minimum royalty payments. Mr. Townsend also was concerned about damage to his business reputation in the event that the Partnership did not prove profitable. The second thirty-day extension of time for CemCom's exercise of the option expired on February 28, 1984, and CemCom failed to exercise the option. Between March and June of 1984, no option or other agreement for CemCom's acquisition of the New Technology was in existence. In June 1984, *104 while negotiations with venture capital sources were still continuing, CemCom and the Partnership entered into a 90-day exclusive license of the New Technology under which the Partnership generally would receive royalties equal to four percent of CemCom's gross sales. In September 1984, the Partnership and CemCom entered into a perpetual exclusive licensing agreement (the "1984 Licensing Agreement") for the New Technology. The 1984 Licensing Agreement provided for reduced minimum royalties payable as follows: Amount Payable by
Due Date
CemCom to Partnership
Within 90 days of September 22, 1984
$ 356,000
1/1/85
213,000  6/30/85
213,000  1/1/86
213,000  6/30/86
213,000  1/1/87
213,000  6/30/87
450,430  1/1/88
450,430  6/30/88
450,430  1/1/89
450,430  6/30/89
450,430  1/1/90
450,430  6/30/90
450,430  1/1/91
450,430  6/30/91
450,430  1/1/92
450,430  The due dates for the minimum royalty payments under the 1984 Licensing Agreement fell either exactly on the due dates for the Partnership's deferred payments under the R&D Agreement, or one day prior to such due dates. Although the Partnership *105 paid in cash the amount of $ 168,000 due in January 1984 under the R&D Agreement, all subsequent "payments" from the Partnership under the R&D Agreement were made by way of setoff against minimum royalties payable by CemCom to the Partnership. The 1984 Licensing Agreement formally provided that CemCom could set off minimum royalties owed to the Partnership against the deferred payments due from the Partnership under the R&D Agreement. In conjunction with CemCom's acquisition of the New Technology under the 1984 Licensing Agreement, Mr. Townsend and certain other lenders to CemCom agreed to convert their debt to equity. Such conversion gave Mr. Townsend effective control over CemCom. Between November 1984 and July 1986, six patents were issued by the United States for cementitious materials created by CemCom pursuant to the R&D Agreement. Notwithstanding its scientific progress and the lower minimum royalties provided by the 1984 Licensing Agreement, CemCom continued to experience financial troubles until July 1986. In July 1986, CemCom entered into an agreement with Occidental Chemical Corporation, a subsidiary of Occidental Petroleum Corporation, under which CemCom granted Occidental *106 an exclusive worldwide license to commercialize all CemCom products, technology, and future improvements for a term of 25 years in exchange for royalties equal to a percentage of Occidental's net sales from CemCom products. The terms of the agreement with Occidental, as a practical matter, necessitated an amendment of the 1984 Licensing Agreement. The minimum royalties payable under the revised agreement, and the Partnership's "matching" payments under the R&D Agreement, are as follows (note that the Partnership's payments under the R&D Agreement fall due on January 1 and July 1 of each year, while CemCom's minimum royalty payments are due on January 1 and June 30 of each year): Minimum Royalty Payable
Matching Amount
to Partnership by
Due Under R&D
Due Date
CemCom
Agreement
1/1/87
$ 180,000
$ 168,000
6/30/87 (7/1/87)
395,000  380,430  1/1/88
395,000  380,430  6/30/88 (7/1/88)
400,000  380,430  1/1/89
405,000  380,430  6/30/89 (7/1/89)
410,000  380,430  1/1/90
410,000  380,430  6/30/90 (7/1/90)
410,000  380,430  1/1/91
410,000  380,430  6/30/91 (7/1/91)
410,000  380,430  1/1/92
410,000  380,430  *107 OPINION Trade or Business Requirement under Section 174
Respondent has conceded that, if the Partnership's expenditures in engaging CemCom were incurred "in connection with a trade or business" of the Partnership, they would qualify as research or experimental expenses deductible under section 174. The main dispute in the instant case thus centers on whether such expenditures were in fact incurred in connection with a trade or business of the Partnership. Petitioner bears the burden of proof on the issue. Rule 142(a). Prior to the Supreme Court's decision in Snow v. Commissioner, 416 U.S. 500 (1974), research or experimental expenditures incurred before actual commencement of a trade or business were disallowed as nondeductible pre-opening expenses. See Koons v. Commissioner, 35 T.C. 1092 (1961). However, in Snow, the Supreme Court, after comparing the "in connection with" language of section 174 with the "in carrying on" language of section 162, established that a taxpayer need not currently produce or sell any product in order to obtain a deduction for research or experimental expenditures. The Supreme Court reasoned that the *108 policy behind section 174 -- to aid "small or pioneering business enterprises" as well as more established ones -- calls for a more relaxed "trade or business" requirement under section 174 than applies under section 162. Snow v. Commissioner, 416 U.S. at 503. In Snow, it was assumed that, during the year in issue, the partnership in question expected to produce and sell the resultant technology itself if the development effort were successful. Levin v. Commissioner, 832 F.2d 403, 405 (7th Cir. 1987), affg. 87 T.C. 698 (1986). Thus, the characterization of the partnership therein as a "business" versus an "investment or financing vehicle" was not at issue. In Green v. Commissioner, 83 T.C. 667 (1984), we clarified that Snow "did not eliminate the 'trade or business' requirement of section 174 altogether," 83 T.C. at 686, and held that a partnership which entered into a research and development agreement and on the same day divested itself of all ownership rights in the inventions to be produced under the agreement (through the grant of an exclusive license) could not deduct the payments made *109 under the research and development agreement under section 174. In concluding that the partnership in Green was never more than an investor in the research activities, we noted in Green that it "would never be able to produce or market the inventions" itself because it had disposed of all of its rights to such inventions at the outset. 83 T.C. at 688. We further stated that, unlike in Snow, the partnership "was not the up-and-coming business which section 174 is intended to promote." 83 T.C. at 687. In Levin v. Commissioner, 87 T.C. 698 (1986), affd. 832 F.2d 403 (7th Cir. 1987), we similarly held that partnerships which entered into research and development agreements and simultaneously granted the exclusive right to manufacture, use, and market the products of the research to another entity were not entitled to deductions under section 174. The licenses in question in Levin were for terms which would exceed the patentable lives of the products and which would extend for "virtually the entire lives of the partnerships." 87 T.C. at 727. In reaching our conclusion in Levin, we stated *110 that "In short, we are thoroughly persuaded that when [the partnerships] were organized in 1979, they never intended to engage in trades or businesses at any time in the future, and this conclusion is supported by the limited nature of their activities in the years following." 87 T.C. at 728 (emphasis added). On appeal, the Seventh Circuit in Levin noted that, on paper, the partnerships were entitled to function as more than passive investors; they were entitled to buy completed machines for resale and were entitled to receive, and presumably exploit, any collateral technology developed as a "byproduct" of the research and development agreement. 832 F.2d at 406. Nonetheless, the Seventh Circuit affirmed our decision, and in doing so stated that: The Tax Court looked past the documents to the expectations of the parties at the time. It asked whether the partnerships reasonably anticipated availing themselves of the privileges they possessed on paper. That is the right question; pen and ink divorced from reasonable business expectations do not a "trade or business" make. [832 F.2d at 406; emphasis supplied.] Petitioner *111 urges us to distinguish Green and Levin from the instant case on the ground that here, unlike in those cases, the Partnership did not dispose of its rights in the New Technology simultaneously with entering into the R&D Agreement but instead could have exploited the New Technology on its own in the event that CemCom failed to acquire the New Technology. Petitioner further argues that there was a significant possibility that CemCom would not exercise such option and that such possibility should be sufficient to satisfy the trade or business requirement of section 174. Our recent decision in Diamond v. Commissioner, 92 T.C. 423 (1989) (on appeal, 4th Cir., October 16, 1989), however, which was issued subsequent to the briefs in the instant case, specifically adopted the reasoning of the Seventh Circuit in Spellman v. Commissioner, 845 F.2d 148 (7th Cir. 1988), affg. a Memorandum Opinion of this Court. Diamond and Spellman undercut petitioner's arguments by clarifying that distinctions based on a lack of simultaneity of an exclusive licensing agreement with a research and development agreement, or on legal entitlement *112 to enter a trade or business, are not determinative of deductibility under section 174. Rather, the controlling inquiry under section 174 is whether, during the years in issue, there was any "realistic prospect" that the entity in question would enter a "trade or business" involving the technology being developed. Diamond v. Commissioner, supra at 439. If such prospects are not realistic, the entity should be treated as no more than a passive investor or financing vehicle -- not eligible for deductions under section 174. [6]
In Spellman v. Commissioner, supra, the taxpayers were limited partners in a second-tier limited partnership. The first-tier limited partnership entered into a research and development agreement with a drug manufacturer, the specific goal of which was to develop new penicillins. Under the agreement, the drug manufacturer would have the exclusive rights to make, *113 sell and license any new penicillins developed under the agreement in exchange for royalties to be paid to the first-tier limited partnership. The taxpayers claimed, however, that such rights would not vest in the drug manufacturer until the products were actually developed, and until then would remain with the first-tier limited partnership. The partnership, in addition, would own any pharmaceutical "byproducts" (i.e., drug products other than penicillins) developed under the agreement -- subject to the drug manufacturer's option to purchase such byproducts for $ 20,000. In analyzing whether the first-tier limited partnership's rights with respect to the pharmaceutical products were sufficient to satisfy the "trade or business" requirement of section 174, the Seventh Circuit first stated that it is "important to determine whether the prospects for developing a new product that will be exploited in a business of the taxpayer are realistic * * *. If those prospects are not realistic, the expenditure cannot be 'in connection with' a business of the taxpayer" for the purpose of satisfying section 174. 845 F.2d at 149. The court then focused on the taxpayers' claim concerning *114 the partnership's rights during the development phase, -- i.e., prior to the "vesting" of marketing rights in the manufacturer. In that regard, the Court stated that: This reservation of rights would be significant if [the manufacturer] went broke during the developmental period, but probably not otherwise; and while, in the event of [the manufacturer's] bankruptcy, the reservation would give [the partnership] additional assets, it would no more put it in the pharmaceutical business than foreclosing on a real estate mortgage would make a bank a real estate company. [845 F.2d at 150] The Seventh Circuit then turned to an analysis of the impact of the partnership's rights to pharmaceutical "byproducts" produced under the research and development agreement, stating that: If * * * [the partnership] were merely financing [the manufacturer's] R&D in exchange for royalties, there would be no possible argument for a deduction under section 174(a)(1). * * * The only difference between the hypothetical case and our case is that [the partnership] had a prospect of recovering not only royalties but also byproducts, and if that happened and it decided to develop *115 the byproducts rather than sell or license their development to another firm like [the manufacturer], it would be in the pharmaceutical business. But this prospect was remote * * * * * * No other inference is possible than that the provision entitling [the partnership] to develop the byproducts if (but only if) [the manufacturer] didn't exercise its option was inserted only to create a colorable claim to deductibility under section 174(a)(1). [845 F.2d at 150-151] In concluding that the prospect of the partnership's entering the pharmaceutical business was too remote to justify a deduction under section 174, the court reasoned that such prospect was remote "not only because [the partnership] presented no evidence that it has, or is likely ever to acquire, a staff, relevant experience, or anything else indicating a likelihood or intention of entering such business" but also because the manufacturer's option to acquire the byproducts for only $ 20,000 would "prevent [the partnership] as a practical matter from ever entering the pharmaceutical business" as a result of the venture in question. [7] More specifically, the court noted that if the byproducts *116 turned out to be worth more than $ 20,000, the manufacturer would exercise its option and the partnership would lose all rights to market them; if the byproducts were worth less than $ 20,000, the partnership would be left with rights to market such byproducts but would not exercise such rights because the costs associated with such marketing would exceed the possible profits from such marketing. The court also found the possibility that the manufacturer would make a "mistake," by failing to exercise its option when the byproducts were, in fact, valuable, too unlikely to warrant a deduction under section 174. 845 F.2d at 151. In Diamond v. Commissioner, supra, we focused n the existence of an option in holding that a partnership's prospects of entering a trade or business involving certain technology were too remote to justify a deduction under section 174. The taxpayer in Diamond was a limited partner in "Robotics," a Maryland limited partnership which became a limited partner in the "Project Partnership," an Israeli *117 limited partnership. The general partner in the Project Partnership was a publicly held Israeli corporation, Elco, which was involved in robotics technology and sought outside funds to allow it to pursue its research goals. Under the Project Partnership agreement, Elco was required to contribute the rights to its technology to the Project Partnership and to pursue further research activities on behalf of the Project Partnership; Robotics was required to contribute the vast majority of the cash needed to carry out such activities. Elco also was granted an option, under the Project Partnership Agreement, to acquire an exclusive and irrevocable license to carry out all production, manufacturing, and marketing of any product developed under the agreement. The option was granted to Elco in its corporate capacity "'and not in [Elco's] capacity as a general partner of the Project Partnership,'" 92 T.C. at 429 (emphasis supplied), and Elco had the right to exercise the option in its sole discretion at any time. In the event that Elco exercised its option, it would be required to pay specified "fees" to the Project Patrnership based on its gross receipts. Robotics, *118 as limited partner, was entitled to 99 percent of such "fees," subject to Elco's option to convert Robotics' rights to the fees into an equity interest in either Elco or a U.S. affiliate of Elco. As of the date of trial in Diamond, Elco had not exercised its option to become the exclusive licensee, and Elco and Robotics were negotiating a possible amendment of the Project Partnership Agreement under which profits from any sale of the technology might be shared on a 50-50 basis. Elco had also indicated a possible willingness to allow Robotics to acquire nonexclusive rights in the technology. In analyzing the question whether Robotics' activities during the years in question were sufficient to satisfy the "trade or business" requirement of section 174, we noted in Diamond that Robotics' general partners had "an abundance of relevant experience" in the area being pursued by the Project Partnership, which they could presumably employ to assemble a marketing staff in the event that Elco failed to exercise its option. 92 T.C. at 441. In that sense, we noted at the facts in Diamond were distinguishable from those in Spellman but disallowed the section 174 *119 deduction based on our conclusion that there was "no realistic prospect" during the years at issue that the robot to be developed "would ever be exploited in any trade or business carried on by any one other than Elco." 92 T.C. at 439. In that regard, we reasoned, following Spellman, that Elco "surely" would exercise its option to license the robot if the robot appeared commercially promising, and that if Elco (in its sound business judgment) declined to exercise the option, the Project Partnership and Robotics simply would be left "with the right to develop an asset whose costs would not appear to justify additional investment." 92 T.C. at 440-441. We also noted that, although a possible alteration of the contractual relationship between Elco and Robotics might "more closely align" Robotics with the "trade or business" of marketing the robot, such subsequent alteration would have no impact on our decision with respect to the tax years in question, especially where such alteration was not shown to have been "contemplated or foreseeable" during those years. 92 T.C. at 442-443. We concluded our section 174 discussion in Diamond by *120 stating that the arrangement in question was not the type of arrangement which Congress intended to benefit in passing section 174. Quoting Snow v. Commissioner, 416 U.S. 500 (1974) for the proposition that section 174 was designed to "'equalize the tax benefits of the ongoing companies and those that are upcoming and about to reach the market,'" we concluded that the purpose of section 174 was "not to elevate the status of mere investors in those companies." 92 T.C. at 443 (emphasis added). [8]
*121 Applying the test laid out in Spellman and adopted in Diamond to the instant case, we are unconvinced that there was, during the years in issue, any "realistic prospect" that the New Technology would be exploited in a "trade or business" of the Partnership. Rather we find that the Partnership was organized and operated as a passive investment vehicle. Contrary to petitioner's assertions, the Supreme Court's decision in Snow v. Commissioner, supra, in no way compels a different conclusion. The Private Placement Memorandum contained neither specific plans nor economic forecasts related to the possibility that the Partnership might itself engage in the marketing of the New Technology; no mention was made of hiring a Partnership staff experienced in that area or of acquiring real or personal property toward such an end. In any case, as virtually all Partnership funds were to be disbursed in payment cf the Partnership's obligations under the R&D Agreement, there would be no Partnership funds available to start such marketing operations with respect to the New Technology, and there was on duty on the part of the partners to contribute additional funds for *122 such purpose. The only arrangement provided for in respect of the contingency that CemCom would not exercise its option was CemCom's agreement to grant the Partnership a nonexclusive perpetual license of the Old Technology in such event. Unlike the payment terms of CemCom's option, which were specified in detail at the inception of the Partnership, however, the terms of the license which might be granted by CemCom to the Partnership were left to future determination by an appraiser, and no plans regarding the source of funding for such license payments were made. Moreover, the nominal amount ($ 100/year) payable by the Partnership for its right to "use" the Old Technology in its performance of the R&D Agreement is suggestive of the insignificance of the Partnership's anticipated use thereof. The Private Placement Memorandum indicated that the Partnership was formed for the purpose of entering into contractual arrangements with CemCom; no other research activities or ventures were contemplated for the Partnership, which would go out of existence after it stopped receiving royalties or sales proceeds with respect to the New Technology (or, at latest, on December 31, 2029). Mr. *123 Townsend's candid testimony at trial clearly indicates that his intent in structuring the Partnership, and in his role as general partner, was to transfer the New Technology "back" to CemCom in exchange for royalties. When asked about the purpose of the noncompetition clause imposed on CemCom and its principals under the Transfer Agreement, Mr. Townsend stated that: what better way of giving them an incentive than in effect saying that -- now, understand the cement business had been their life for a long time. That non-compete agreement basically says if you don't exercise this license, you've got to go out of business in this whole area that you've been working in. * * * that was a major incentive. They had to basically change their occupations if they didn't make it a big booming success. Petitioner, on brief, emphasizes that, because of the high minimum royalties provided for under the option, Cemcom likely would not exercise it. While such onerous minimum royalties do create a factual distinction between the instant case and the Diamond and Spellman decisions, the distinction is not material in that the amount of the royalties does not supply the required prospect *124 of a "trade or business" to be carried on by the Partnership. Moreover, we do not find it significant that, unlike in Diamond, CemCom's option was not exercisable immediately or at "any time." The time period within which CemCom's option could be exercised (in the event that the technology was patentable) coincided with the intended completion date of the projects under the R&D Agreement. Similarly in Spellman, the possibility that the manufacturer's rights in the technology might not vest until the technology was developed fully was, as explained above, insufficient to satisfy the "trade or business" requirement of section 174. [9]
The parties have stipulated that, on December 31, 1981, the exercise of CemCom's option in accordance with its original terms was uncertain, and we agree with petitioner that the possibility of its nonexercise in accordance with such original terms was significant. *125 Such possibility, however, is insufficient to satisfy the trade or business requirement of section 174. More specifically, the weight of the evidence in the instant case suggests that the nonexercise of the option by CemCom was expected to trigger a renegotiation of the minimum royalty provision -- not independent marketing efforts by the Partnership. The following testimony by Mr. Townsend is particularly illustrative: Q: * * * what did you say to the limited partners in respect to what Research One could do if CemCom did not exercise? A: Well * * * the Probable alternatives were that we could negotiate a license with them at some lesser number. Now, let's talk about that. Here is a company that -- whose life is cement. Here is a company that's, in addition to the previous history, has had a couple of years at our expense to learn about this and who has the contacts in the cement industry and theoretically over that period of time, has been looking for markets for it. And what better likely purchaser of our technology than CemCom. * * * In addition to that * * * they have an added incentive to negotiate real hard to get a license because if they don't, they've *126 got to leave that business. So, I really felt that we were in a real good position to negotiate with them something that really approximated the research's true value, and I think we're naive if we think that anybody's going to pay us more than whatever its true value is. * * * What I said to them was that the likelihood of me being able to sell that technology back to CemCom for all of the value of the note or at least a major portion of the note, I believe, is extremely high given the other things that we've talked about. Although Mr. William Hanford, a member of CemCom's management during the years at issue, testified that he would have preferred to simply wait until 1991 for the Partnership's $ 2.8 million deferred payment to fall due rather than renegotiate the option and continue work on the New Technology, we hold that even the possibility that CemCom would not acquire the New Technology at all does not amount to a finding that the Partnership's prospects for entering a trade or business were realistic. Petitioner argues that, because the goal of the tooling project was a "ready mix" cement that could be marketed by the Partnership, the Partnership was especially interested *127 in the tooling project. The evidence, however, indicates that the "ready mix" concept was intended to allow CemCom, rather than the Partnership, to market the cement without becoming a manufacturer of aerospace tooling. Mr. Townsend's intention that the New Technology would be transferred to CemCom in exchange for royalties is borne out by his actions during 1982. When Mr. Townsend was approached by CemCom about the possibility of forming a second reearch-oriented limited partnership, Mr. Townsend initially refused that proposition. However, when he was convinced that CemCom had bound itself to exercising the option provided by the Transfer Agreement, Mr. Townsend agreed to the proposal. In that regard he testified as follows: My real concerns at that stage of the game were -- number one, I didn't want to bet on that horse a second time till I found out if he won the first race; and number two, I'm exposed for these notes. Their suggestion of exercising the options solved both of those problems. First of all, the minute they exercise the option -- now, let me caveat this by saying, at that time, I thought that took me off the risk of the notes * * * at that stage of *128 the game, a least thought that it did; and if they were confident enough in it that they'd exercise the options, then apparently I had a winning horse that I was betting on. Although our decisions should not be based on hindsight, Diamond v. Commissioner, 92 T.C. 423, 443 (1989), we may take into account a taxpayer's actions in years subsequent to the years in issue in evaluating the taxpayer's prospects during the years in issue. Levin v. Commissioner, 832 F.2d at 406 n.3 (Tax Court was entitled to inquire whether subsequent events were consistent with its judgment of the facts available in the year in issue). In the case of the Partnership, Mr. Townsend's actions during late 1983 and 1984 provide further support for our conclusion that the Partnership had no realistic prospect of entering a "trade or business" involving the New Technology. Mr. Townsend's persistent efforts to assist CemCom in obtaining the funds needed to acquire the New Technology from the Partnership signify the critical importance of such acquisition to the Partnership. That such efforts continued unabated after CemCom's option "extension periods" had expired (and the *129 Partnership owned the New Technology free and clear), is particularly suggestive. Indeed, Mr. Townsend's testimony indicates that, while the possibility of the Partnership's marketing the New Technology on its own behalf may have been considered, his main focus even after CemCom's option period and the extension thereof had expired was to assist CemCom in finding sources of capital adequate to insure the Partnership a royalty stream which would offset the partners' liability for the third increment payable under the R&D Agreement. When asked why he went so far as to advance significant funds of his own to CemCom during such time period, Mr. Townsend responded that: The primary reason was -- again, my whole motivation from day one is to impress upon people that I'm not a typical syndicator that puts them into something and gets a bunch of tax losses and then flies town * * * So, in the final analysis, * * * if I intended to be able to say that with a straight face from then on, I had to really put my money where my mouth was; and I had an obligation to go in there and do everything I possibly could to protect the investors. The consequences would've been rather cataclysmic * *130 * * remember, now, we've got $ 2.8 million worth of notes out there that we're going to have to pay off. So, if I allow this thing to go down the tubes, there's absolutely no potential of being able to pay those things out of revenues and they're going to have to lay the dollars out. So, the primary motivation was to protect the investor. * * * Although petitioner characterizes Mr. Townsend's advances to CemCom as evidence of the Partnership's "business-motivated" involvement with the CemCom project, Mr. Townsend's testimony suggests otherwise. [10]
The 1984 Licensing Agreement accomplished the Partnership's goal of funding the partners' liability for the third increment due under the R&D Agreement with royalties payable by CemCom. Through that mechanism, the limited partners were able to avoid any out-of-pocket expenditure *131 for an amount for which they had already claimed a full tax write-off. As noted above, petitioner bears the burden of proof with respect to the trade or business issue. Petitioner has failed to convince us that there was any "realistic prospect" during the years at issue that the Partnership was or would become the type of "up-and-coming business which section 174 is intended to promote." Green v. Commissioner, 83 T.C. 667, 687 (1984). Petitioner also argues that, irrespective of the likelihood of CemCom's exercise of its option, the Partnership's activities and profit motivation during the years in issue were sufficient to place the Partnership in a "trade or business" under Commissioner v. Groetzinger, 480 U.S. 23 (1987). In Groetzinger, the Supreme Court articulated the concept of "trade or business" as involving an activity engaged in "with continuity and regularity" and for a profit. In particular, petitioner refers to Mr. Townsend's work in monitoring the progress of CemCom's research and in reviewing its expenditures, as well as to his participation in CemCom's marketing efforts and efforts to obtain venture capital. Petitioner further *132 argues that CemCom's research activities were sufficiently "regular and continuous" to constitute a trade or business and should be attributed to the Partnership on whose behalf they were performed; in his brief, petitioner characterizes the Partnership as a "research company." While we agree with petitioner that Mr. Townsend engaged in substantial activity related to the CemCom venture, especially after the Fall of 1983, we believe that such activity was undertaken on behalf of the Partnership in its role as an investor in CemCom's business, as well as in Mr. Townsend's separate role as promotor of the Partnership venture. The majority of Mr. Townsend's efforts vis-a-vis CemCom were spent trying to assure the Partnership its stream of "royalty" income. Such an interest in obtaining royalties is inherent y an "investor-like interest," Green v. Commissioner, 83 T.C. at 688-689, and Mr. Townsend's efforts amounted to no more than the management and protection of an investment. The management of investments is not a trade or business irrespective of the amount of time required to perform the managerial functions. Green v. Commissioner, supra at 688. *133 [11]
Regarding Mr. Townsend's power to review and approve CemCom expenditures, and his receipt of written progress reports from CemCom, we quote the Seventh Circuit in Spellman v. Commissioner, 845 F.2d at 151, which stated that: the fact that [the partnership] reserved the right to monitor [the pharmaceutical company's] use of [the partnership's] money no more put [the partnership] into the pharmaceuticals business than a bond debenture entitling the debenture trustee to inspect the books and plants of the corporation issuing the bonds would make the bondholders joint venturers with the corporation. We note, moreover, that Mr. Townsend's ability to "control" CemCom's expenditures through the mechanism of the escrow account is negated somewhat by his admission at trial that he believed that CemCom could force him to sign checks drawn on the account. Although petitioner emphasizes Mr. Townsend's significant involvement with CemCom's affairs, in his reply brief petitioner also suggests that such involvement was not originally contemplated by the parties. Specifically, *134 petitioner's reply brief states that: At all times, Dennis Townsend was capable and willing to direct the day-to-day activities of CemCom if that was necessary to insure the continued progress of the research. However, during 1981 and 1982 while the relationship between Research One and CemCom was at its peak, day-to-day control was not necessary. * * * It was not until that relationship deteriorated that Research One and Dennis Townsend became compelled to take over and control CemCom's day-to-day activities. The implication that Mr. Townsend's significant involvement with CemCom originally was not contemplated when the Partnership was organized is supported by the testimony of Mr. Hanford, who held a management position at CemCom during the years at issue. The R&D Agreement, moreover, specifically provided that the Partnership's interest in CemCom's research activity was an interest "in results only," negating petitioner's claims that the Partnership had the right to direct such activity. Goulding v. Commissioner, T.C. Memo. 1988-212 (absent contractual right on the part of limited partnership to control research company's services, actual supervision *135 of such services by general partner is not material in deciding whether partnership was to engage in a "trade or business"). Petitioner's claim that CemCom's research activities should be attributed to the Partnership, rendering the Partnership itself a "research company," is without merit; the cases discussed herein make it abundantly clear that the words "on behalf of" in an R&D Agreement are not incantations turning passive investment vehicles into up and coming trades or businesses. The mere presence of a valid business enterprise at one level of a transaction does not automatically entitle passive investors distant from day-to-day operations of the enterprise to the associated tax benefits. Beck v. Commissioner, 85 T.C. 557, 579-580 (1985) (cited in Smith v. Commissioner, 91 T.C. 733, 765 (1988), in which we analyzed a research and development limited partnership as a "generic tax shelter"). We also note that the R&D Agreement required CemCom to indemnify the Partnership in connection with all patent- and trade-secret-related actions. In Property Growth Co. v. Commissioner, T.C. Memo. 1988-258, affd. 889 F.2d 1090 (8th Cir. 1989), *136 we characterized such responsibilities to indemnify as "not those of a licensee, but of the owner of the ultimate product," suggesting that CemCom's research efforts were in substance made on its own behalf. Finally, we note that the Partnership's activity in effecting a transfer of the New Technology to CemCom did not amount to a trade or business. As we stated in Green v. Commissioner, 83 T.C. at 689, "while this Court has held that the exploitation of inventions through regular licenses and sales may constitute a business ( Avery v. Commissioner, 47 B.T.A. 538 (1942)), there is no indication in the present case that [the Partnership] intended to buy and sell inventions for profit on a regular basis." Rather, the New Technology to be developed by CemCom was the only technology in which the Partnership would invest. Although the New Technology consisted of several inventions, "they were acquired and sold in a single, prearranged transaction and therefore may be treated as a single entity. A partnership or joint venture organized to dispose of a single property in an isolated sale, without making substantial improvements to the property *137 between its acquisition and sale, is not in the business of selling property of such kind or character." Green v. Commissioner, supra at 689. Accordingly, respondent's determination disallowing petitioner's claimed deductions under section 174 is sustained. Because we have denied petitioner's deductions for research and development expenses on the ground that the "trade or business" requirement of section 174 has not been met by the Partnership, we need not address respondent's alternate arguments that (1) the Partnership's transactions with CemCom lacked economic substance, were not engaged in for profit, and amounted to a sham and (2) the Partnership's manner of accounting for its liability to CemCom did not clearly reflect income. Deductibility of Miscellaneous Partnership Expenses
In addition to disallowing deductions claimed under section 174, respondent also disallowed deductions related to management fees, investor service fees, and administrative expenses of the Partnership. The burden of proof is on petitioner regarding such deductions. Rule 142(a). Petitioner argues that the management fees, investor service fees, and administrative *138 expenses are deductible under either section 162 or section 212. Regarding section 162, petitioner argues that the Partnership was engaged in a "research business" during the years at issue. That argument already has been considered and rejected in connection with our holding that the Partnership functioned as no more than an investor in CemCom's trade or business activities. Petitioner's section 212 argument is based on our decisions in Hoopengarner v. Commissioner, 80 T.C. 538 (1983), affd. without opinion 745 F.2d 66 (9th Cir. 1984), and Johnsen v. Commissioner, 83 T.C. 103 (1984), revd. 794 F.2d 1157 (6th Cir. 1986), which held that the pre-opening expense doctrine is inapplicable under section 212. Our recent decision in Hardy v. Commissioner, 93 T.C. (December 13, 1989), however, which was filed after the submission of briefs in the instant case, overrules such decisions and holds that a "parity" exists between sections 162 and 212 with respect to the distinction between capital expenditures and ordinary expenses. Thus, under Hardy, an amount which would be treated as a start-up cost not currently *139 deductible under section 162 should not be currently deductible when tested under section 212. In connection with his section 162 discussion on brief, petitioner argued that the miscellaneous expenses in question should not be treated as "start-up expenses" under that provision because, during the years in issue, the Partnership had already arranged financing, acquired a license of the Old Technology, and hired CemCom to perform research. Petitioner further argued that, in the context of a "research company," such as Research One, the level of activity is greatest during the research and development stage. Finally, petitioner noted the Supreme Court's recent decision in Commissioner v. Groetzinger, 480 U.S. 23 (1987), which rejected the requirement that a taxpayer "hold himself out as providing goods or services" to be engaged in a trade or business. Because Hardy compels a "parity" in the treatment of start-up expenditures under sections 162 and 212, we have considered petitioner's section 162 arguments in the context of section 212. See Goldman v. Commissioner, T.C. Memo. 1990-8. Petitioner's argument attributing CemCom's research activities *140 to the Partnership is without merit; as discussed above, the Partnership's investment in CemCom's projects no more turned the Partnership into a "research company" than a stockholder's investment in a corporation puts the stockholder in the trade or business of that corporation. Deputy v. duPont, 308 U.S. 488 (1940). The other activities cited by petitioner also fail to establish that the Partnership was in anything other than a "start-up" or " pre-operating" phase during the years in issue. The fact that an entity organizes itself with funds from investors, enters into contracts, and incurs expenses does not prove that the entity has entered into a trade or business or, by analogy, an income-producing activity. Richmond Television Corp. v. United States, 345 F.2d 901 (4th Cir. 1965), vacated per curiam on other grounds 382 U.S. 68. As we stated in Koons v. Commissioner, 35 T.C. 1092, 1101 (in the context of deciding whether the taxpayer had entered a "trade or business" by purchasing an invention and entering into a research and development contract): The research and experimentation was no doubt in anticipation *141 of the organizing of a business to make business use of an end product when it reached the point of commercial acceptability. At the time the invention was bought by petitioner, however, it was in a preliminary laboratory state, and petitioner entered into the so-called Development Contract in part, at least, to get the benefit of research specialists. He went no further than this in [the year in issue], however. It is our view that this activity was preliminary to the coming into existence of a business * * * [12]
In a more recent case decided under the "facts and circumstances" test of Commissioner v. Groetzinger, supra, we held that a subchapter S corporation's activities in entering into a research and development contract and manufacturing and licensing contracts, selling the requisite *142 number of shares to make such contracts effective, and making initial payments pursuant to the contracts, did not signify the commencement of "trade or business" activities. McManus v. Commissioner, T.C. Memo. 1987-457, affd. without opinion 865 F.2d 255 (4th Cir. 1988). Rather, where the subchapter S corporation expected to earn income only through the rental of mud-logging devices which had not yet become operational during the year at issue, we characterized the corporation's expenses for legal fees, state taxes, and depreciation as "pre-opening expenses" not fully deductible in the year incurred.[13] See also Goldman v. Commissioner, T.C. Memo. 1988-355 (limited partnership which purchased certain patents for fertility devices but experienced technical difficulties in manufacturing the devices had not entered "trade or business" until year in which it could fulfill sales orders for the fertility devices, notwithstanding prior product development and advertising efforts). *143 In the instant case, the only income-producing activity in which the Partnership intended to engage was the licensing of the New Technology in exchange for "royalty" income. During the years in issue, the New Technology was still being "invented" and was not of commercial viability; licensing to parties other than CemCom was thus not feasible during this time period, and CemCom's option could not be exercised until 1983. The Partnership activities cited by petitioner were thus preliminary to the existence of any income-producing activity of the Partnership. Petitioner has failed to prove that the expenses in question were anything other than "costs of starting up a new income-producing activity," Hardy v. Commissioner, supra, or that, during the years in issue, the Partnership held any property for the production of income. Respondent's disallowance of the deductions related to administrative expenses, investor service fees, and management fees of the Partnership is therefore sustained. Respondent also disallowed deductions related to petitioner's allocable share of the Partnership's organizational expenses, which the Partnership elected to amortize over a 60-month *144 period pursuant to section 709(b). We find that such organizational expenses were properly amortized by the Partnership. Diamond v. Commissioner, 92 T.C. 423, 445-446 (1989) (on appeal, 4th Cir., October 16, 1989). Increased Interest under Section 6621(c)
Respondent determined that petitioner is liable for increased interest under section 6621(c), which applies in the case of a "substantial underpayment" attributable to a "tax-motivated transaction." The term "tax motivated transaction" as used in section 6621(c) includes only certain specifically enumerated transactions, including activities not entered into for profit, section 301.6621-2T, Q-4 and A-4, Proced. and Admin. Regs., and "sham or fraudulent transactions." A "sham or fraudulent transaction" as used therein includes a transaction lacking in economic substance. Patin v. Commissioner, 88 T.C. 1086, 1129 (1987), affd. without opinion sub nom. Hatheway v. Commissioner, 856 F.2d 186 (4th Cir. 1988), affd. sub nom. Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), affd. sub nom. Gomberg v. Commissioner, 868 F.2d 865 (6th Cir. 1989). *145 Respondent argues that the transactions entered into between CemCom and the Partnership lacked economic substance, were not entered into for profit, and amounted to a sham. We, however, have disallowed petitioner's deductions related to such transactions on other grounds; specifically, on the ground that the Partnership failed to meet the "trade or business" requirements of sections 174, and, in the case of certain miscellaneous Partnership expenses, based on sections 162 and 212 and the pre-opening expense doctrine. In reaching our conclusions regarding petitioner's claimed deductions, we were not required to determine whether the Partnership's transactions lacked profit motive or economic substance; such determinations would have gone beyond the conclusions reached herein. Thus, as the grounds alleged by respondent in support of his determination of increased interest are not "an integral part of" or "inseparable from" the grounds for disallowance of petitioner's deductions herein, petitioner's underpayments will not be treated as "attributable to" a tax-motivated transaction for purposes of section 6621(c). McCrary v. Commissioner, 92 T.C. 827, 859 (1989). *146 See also Diamond v. Commissioner, 92 T.C. 423, 445-446 (1989) (on appeal, 4th Cir., October 16, 1989); Smith v. Commissioner, 91 T.C. 733, 766 (1988); Keenan v. Commissioner, T.C. Memo. 1989-300; Barber v. Commissioner, T.C. Memo. 1989-284; Wilson v. Commissioner, T.C. Memo. 1989-266; Chung v. Commissioner, T.C. Memo. 1986-131. Accordingly, the increased rate of interest for which that section provides does not apply. To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code, as amended and in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. The deficiency in this case for the year 1979 arises from the disallowance of an investment tax credit carryback from the year 1982. The investment tax credit itself is unrelated to petitioner's investment in the Partnership. Thus, as used herein, the term "the years in issue" refers only to 1981 and 1982.↩
3. The tax opinion included in the Private Placement Memorandum concluded that if the New Technology were indeed patentable, CemCom's payments therefor as a result of the exercise of its option would be entitled to long-term capital gain treatment under section 1235.↩
4. As mentioned above, the Partnership would not be considered in default until 1991 with respect to the noted installments due under the R&D Agreement if Partnership funds were inadequate to make such payments. ↩
5. The Transfer Agreement provided that the due dates for CemCom's minimum royalty payments would be adjusted in the event that the New Technology was not patentable, as CemCom's option exercise date might be delayed in that event.↩
6. See also Property Growth Co. v. Commissioner, T.C. Memo. 1988-258, affd. 889 F.2d 1090↩ (8th Cir. 1989) (partnership held to constitute an "investor providing risk capital" not entitled to deductions under section 174).
7. See also Property Growth Co. v. Commissioner, supra↩ (option price unrelated to fair market value).
8. In Property Growth Co. v. Commissioner, T.C. Memo. 1988-258, affd. 889 F.2d 1090 (8th Cir. 1989), we similarly held that a partnership's interest in certain technology was "limited to that of an investor who provided risk capital" and accordingly denied deductions claimed under section 174. The partnership therein had simultaneously entered into a Technology Development Agreement, a License Agreement, and an Option Agreement with a research company. The License Agreement allowed the research company to exploit the technology being developed on an exclusive basis for a period of several years or until the exercise of the purchase option granted to the research company under the Option Agreement. Such purchase option was exercisable between one year and 181 days after the invention was reduced to practice, and called for the payment of $ 6,000 plus the continuation (for approximately 35 additional years) of the 10 percent royalty payable under the License Agreement. In analyzing the effect of the agreements entered into between the research company and the partnership, we stated that the agreements, taken together, allowed the research company to maintain "complete control" over the project. We characterized the partnership's "sole role" as the contribution of capital in exchange for a royalty interest, and found that the terms of the option belied the taxpayer's claim that the partnership actually "owned" the technology being developed.↩
9. See also Property Growth Co. v. Commissioner, supra↩ (research company's option to acquire technology from partnership exercisable no sooner than one year after technology reduced to practice; partnership fails "trade or business" requirement of section 174).
10. See also Property Growth Co. v. Commissioner, T.C. Memo. 1988-258, affd. 389 F.2d 1090↩ (8th Cir. 1989) (partnership failed "trade or business" requirement of section 174 despite fact that founder of general partner assisted research company in locating customers and arranged for research company to receive financing).
11. See also Property Growth Co. v. Commissioner, supra↩.
12. Our analysis in Koons, which preceded the Supreme Court's decision in Snow v. Commissioner, 416 U.S. 500 (1974), was concerned with the deductibility of expenditures under section 174. Subsequent to Snow, such analysis is no longer relevant under section 174 but is relevant under section 162 and, pursuant to Hardy↩, under section 212.
13. In McManus, we acknowledged that the Court of Claims and the Court of Appeals for the Federal Circuit in part have rejected Richmond Television and have held that certain recurring expenses may be deducted even before the business is in a position to earn income. Petitioner on brief cites Blitzer v. United States, 684 F.2d 874 (Ct. Cl. 1982), in which the Court of Claims applied such analysis. As noted in McManus, this Court has criticized the validity of that analysis, and we are, in any event, not bound to apply it here. See also Johnsen v. Commissioner, 83 T.C. 103, 117 n.5 (1984), revd. on other grounds 794 F.2d 1157 (6th Cir. 1986) (declining to follow Blitzer↩ to the extent inconsistent with the position of this Court regarding the commencement of "trade or business" activities).