JEROME P. COLEMAN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; EDWARD M. AND MARGARET A. MAHER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Coleman v. Commissioner
Docket Nos. 28983-87, 34893-87
United States Tax Court
T.C. Memo 1990-357; 1990 Tax Ct. Memo LEXIS 374; 60 T.C.M. (CCH) 123; T.C.M. (RIA) 90357; July 16, 1990, Filed *374 Decisions will be entered under Rule 155. Richard A. Levine and Theodore D. Peyser, for the petitioners. Vincent J. Guiliano and Elizabeth P. Flores, for the respondent. WELLS, Judge. WELLS
MEMORANDUM FINDINGS OF FACT AND OPINION In these consolidated proceedings, [1] respondent determined deficiencies in and additions to petitioners' Federal income taxes as follows: Additions To Tax
Petitioners
Year
Deficiency [2]Under Section 6653(a) Jerome P. Coleman
1981
$ 10,598.00
Edward and
Margaret Maher
1981
* 12,974.40
$ 648.72 **
1982
148.88
Respondent moved for leave to file an amendment to answer out of time so as to assert additions to tax under section 6653(a) against petitioner Jerome Coleman. The Court denied respondent's motion as prejudicial to petitioner Jerome Coleman. *375 The instant case involves the allowability of deductions for losses arising out of petitioners' investment in the York Research Silver Technology Limited Partnership (the "Partnership"). After concessions, the issues for our consideration are: (1) whether certain research and experimental expenditures of the Partnership were made "in connection with trade or business" of the Partnership; (2) whether certain miscellaneous expenses of the Partnership were properly deductible; (3) whether petitioners Edward and Margaret Maher are liable for additions to tax for negligence for the year 1981; and (4) whether the increased rate of interest on substantial underpayments attributable to tax-motivated transactions is applicable for the year 1981. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and accompanying exhibits are incorporated herein by this reference. At the time of filing his petition in the instant case, petitioner Jerome Coleman was a resident of New York, New York. At the time of filing their petition in the instant case, petitioners Edward and Margaret Maher were husband and wife and resided in Scarsdale, New York. Combustion Equipment Associates *376 ("CEA") was founded in 1953 by Robert Beningson ("Mr. Beningson"), the promoter of the Partnership in the instant case. CEA engaged in business as a manufacturer, marketer, and contractor in the field of environmental and energy conservation. Mr. Beningson served as chief executive officer of CEA until 1981. York Research Corporation ("York") was incorporated in 1959 to engage in the business of scientific research, industrial planning, manufacturing and related activities. In 1969, CEA purchased 54 percent of the stock of York from its original founder. In connection with such acquisition, Mr. Beningson became the Chairman of the Board of Directors of York. The balance of York's stock was publicly held. Mr. Beningson hired Mr. Frances Govan, a scientist he had met while serving on a National Academy of Sciences panel, to be the President of York. Under Mr. Govan's direction, York became a major contractor for the Environmental Protection Agency, among other clients. In approximately 1971, Mr. Beningson acquired an additional block of approximately 20,000 shares of York stock which originally was placed in a trustee account for his children. In 1976, Mr. Govan left his position *377 at York and was transferred to one of CEA's medium-sized divisions. Mr. Beningson hired the former Environmental Commissioner of the State of Connecticut, Mr. Beck, to succeed Mr. Govan, but Mr. Beck left CEA a few months later. Mr. Beningson then hired Dr. Kenneth Melmed, a first cousin of Mr. Beningson, to serve as President of York, on Mr. Govan's recommendation. In approximately 1978, Dr. Melmed became the majority shareholder of York by purchasing the block of York stock owned by CEA. Mr. Beningson resigned his position as Chairman of the Board of Directors of York, but did not dispose of the approximately 20,000 shares of York stock which had been held in trust for his children. In 1980, Mr. Beningson acquired 90,000 shares of York stock from Dr. Melmed, in an effort to assist his cousin out of personal bankruptcy. By the fall of 1981, York began experiencing financial difficulties due to changes in the political climate that adversely affected York's environmental consulting business. York was occupying a large building which was partly empty, and badly needed cash to defray its overhead. York also hoped to convince its stockholders that it had a future. Mr. Beningson *378 was asked by members of the Board of Directors of York to rejoin the Board in order to help York find new business opportunities, and rejoined the Board in October 1981. Shortly after rejoining York's Board of Directors, Mr. Beningson learned of a concept for the recovery of silver from scrap metal (the "silver recovery process") from its two inventors, Dr. Melmed and Dr. Norman Lyshkow, a consultant to York who previously had worked for CEA. Mr. Beningson felt that such concept had profit potential in light of expectations that the price of silver would rise and decided to raise funds for the development of the technology. It was hoped that a silver recovery system could be developed which would be useful in various businesses including the jewelry and dental businesses. On December 24, 1981, Mr. Beningson formed the Partnership, under Connecticut law, to promote and fund research and development of the silver recovery process. Mr. Beningson's personal holding company, RRR's Ventures, Ltd. ("RRR") (an acronym standing for the first names of Mr. Beningson's immediate family) was incorporated on December 23, 1981, and became the general partner of the Partnership. Mr. Beningson was *379 a long-standing client of the law firm of Townley and Updike at the time that he formed the Partnership. Of the 12 individuals that became limited partners in the Partnership, a majority were or subsequently became partners in that law firm, which also prepared the Private Placement Memorandum offering units in the Partnership (the "Private Placement Memorandum"). On December 29, 1981, Drs. Melmed and Lyshkow executed assignments granting all of their rights in the then-existing silver recovery process to the Partnership in exchange for $ 1,000. On December 31, 1981, the Partnership issued two checks, each in the amount of $ 500, to Drs. Melmed and Lyshkow. Both Dr. Melmed and Dr. Lyshkow endorsed their checks over to York. The Partnership also entered into the following agreements with York on December 31, 1981: (1) a Research and Development Agreement (the "R&D Agreement"), (2) an Option and Non-Exclusive License Agreement (the "Non-Exclusive Option Agreement"), (3) an Option and Exclusive License Agreement (the "Exclusive Option Agreement"), and (4) an Option and Purchase Agreement (the "Purchase Option Agreement"). The R&D Agreement required York to use its "best efforts" to *380 conduct a research and development program for the Partnership related to the silver recovery process. In exchange for such research and development services, the Partnership agreed to pay York $ 592,000 as follows: (1) $ 92,000 in cash upon execution of the R&D Agreement, (2) $ 50,000 by delivery of a non-interest bearing promissory note of the Partnership due June 15, 1982, together with agreements under which each limited partner of the Partnership assumed liability for his proportionate share of such note; (3) $ 225,000 by delivery of a non-interest bearing promissory note of the Partnership due January 15, 1986, together with assumption agreements from the limited partners of the Partnership, and (4) $ 225,000 by delivery of a non-interest bearing promissory note of the Partnership due January 15, 1987 together with assumption agreements from the limited partners of the Partnership. On its financial statements filed with the SEC and in the reports to its stockholders, York recorded revenues of $ 197,000 for its fiscal year ended September 30, 1982 and $ 395,000 for its fiscal year ended September 30, 1983 with respect to its fees under the R&D Agreement. The promissory notes *381 and related assumption agreements under the R&D Agreement were valuable to York as collateral for obtaining needed loans. The R&D Agreement stated the Partnership's intent to secure section 174 treatment for payments made thereunder, and on its 1981 Federal income tax return, the Partnership deducted the $ 592,000 fee provided for by that agreement. Petitioners, in turn, deducted their allocable shares of such fee, which, along with the deductions for miscellaneous expenses of the Partnership, have been disallowed by respondent. The deductions claimed by petitioners under section 174 for the year 1981 were approximately equal to three times the cash contributions they were required to make to the Partnership in 1981 and 1982. The R&D Agreement was typed, except for the recitation of amounts due from the Partnership, which were handwritten in spaces left blank in the Agreement. The fee to be paid to York under the Agreement was determined only after the number of Partnership Units sold was known; the purchase price of such Units consisted of an up-front payment of $ 11,500 plus an assumption of liability for the deferred payments to be made by the Partnership under the R&D Agreement. *382 Under the Agreement of Limited Partnership for the Partnership, however, RRR could, between January 1, 1983, and December 31, 1985, by agreement with each limited partner, purchase such limited partner's Unit(s) in the Partnership in exchange for 100 shares of York common stock. Such purchase would relieve the limited partner of any further liability with respect to the deferred payments due from the Partnership under the R&D Agreement. In the event that the holders of two-thirds of the Partnership Units agreed to sell their Units to RRR under such provision, the remaining limited partners would be required to sell. The R&D Agreement provided that York would deliver a prototype of the silver recovery process and related diagrams, manuals, etc. to the Partnership by December 31, 1982, but also stated that the payments due thereunder were nonrefundable even if a "production ready Prototype" was not delivered by York. York generally was not paid for its services with promissory notes. The Non-Exclusive Option Agreement gave York the option to acquire a non-exclusive license of the Silver recovery process (the "Non-Exclusive Option") for the purpose of manufacturing, marketing, leasing, *383 selling, or otherwise disposing of or using such technology. The Non-Exclusive Option was exercisable within 10 days after York's delivery of a product prototype to the Partnership, and the nonexclusive license was to continue for 5 years unless terminated sooner by York's exercise of its rights under the Exclusive Option or Purchase Option Agreements. The Non-Exclusive Option Agreement called for the payment of royalties by York to the Partnership in the amount of 14 percent of York's gross revenues related to the silver recovery process or 14 percent of the actual silver recovered by York. York also was granted "most favored licensee" status under the agreement, which meant that if the Partnership licensed the silver recovery process to any entity other than York, York would be entitled to a royalty rate equal to the most favorable royalty rate granted by the Partnership. The Non-Exclusive Option Agreement further provided that York's rights under the Exclusive Option and Purchase Option Agreements were exercisable during the last 4 years of the 5-year nonexclusive license period, and that the nonexclusive license would terminate upon York's exercise of the rights provided under *384 either of such other agreements. The Exclusive Option Agreement provided York with the right to obtain an exclusive, worldwide, perpetual license of the silver recovery process (the "Exclusive Option") for the purpose of manufacturing, marketing, leasing, selling, or otherwise disposing of or using such technology, in exchange for royalties generally equal to 20 percent of York's gross revenues from the technology. Such royalties were to be payable until the expiration of any patents on the silver recovery process or, if no such patents were issued, for 17 years. No mention was made in the Exclusive Option Agreement of the possibility that the Partnership might previously have granted nonexclusive licenses to entities other than York, and no provision was made in the Exclusive Option Agreement with respect to such contingency. [3]
The Purchase Option Agreement gave York the right to purchase all of the Partnership's interest in the silver recovery process for the sum of $ 2,250,000 (the "Purchase Option"). (Like the R&D Agreement, the Purchase Option Agreement *385 was typed, except for recitation of the contract price.) The Purchase Option Agreement also stated that the amount payable thereunder would be "treated as revenues paid * * * under the Recourse Promissory Notes due January 15, 1986 and 1987 from the Partnership to York" and that payment of the Purchase Option price could be made (upon agreement of the parties) in stock of York. (For purposes of valuation of the York stock, the determination of the York Board of Directors would be final.) The Partnership was not obligated to sell the silver recovery process to York under the Purchase Option Agreement unconditionally; if the royalties payable to the Partnership under the Non-Exclusive Option Agreement for the 12-month period preceding York's attempted exercise of the Purchase Option exceeded $ 200,000, the Partnership had the right to refuse to sell. The Exclusive Option Agreement also provided that upon exercise of the Exclusive Option, all rights under the Purchase Option Agreement would terminate. The R&D Agreement obligated the Partnership to apply at least 50 percent of all revenues received from York pursuant to one or more of the above option agreements to the payment of the *386 promissory notes due under the R&D Agreement in 1986 and 1987. The summary contained on page one of the Private Placement Memorandum stated that the proposed activities of the Partnership were "to promote and fund the design and development" of the silver recovery process. The Private Placement Memorandum later stated that the Partnership's "principal objective" was: to promote and fund the design, development, manufacturing and marketing of a silver recovery process, with a view towards earning royalties from the licensing of the rights to use, manufacture and market the System [emphasis supplied],
and further noted that: The Partnership will receive all ownership rights to the System, but plans to license the Contractor [York] to manufacture and market the System on a worldwide basis. [Emphasis supplied.]
No plans were provided in the Private Placement Memorandum with respect to the possibility that York might fail to exercise the Exclusive Option or Purchase Option; the Private Placement Memorandum contained no discussion of manufacturing or marketing activities by the Partnership or of the funds that would be needed for such activities. [4] The funds received by the Partnership from *387 the sale of Partnership Units were to be used in their entirety to satisfy the Partnership's obligations under the R&D Agreement and to pay other initial expenses of the Partnership. Limited partners were not required to make capital contributions or loans to the Partnership beyond the initial cash purchase price for the Units ($ 11,500 per Unit) plus the assumptions of liability for the deferred payments due under the R&D Agreement. The Private Placement Memorandum also cautioned investors that the General Partner of the Partnership was "engaged in business activities other than the Partnership and will spend only such time in the conduct of the Partnership's affairs as it deems necessary." The Private Placement Memorandum described the Non-Exclusive Option Agreement, *388 Exclusive Option Agreement, and Purchase Option Agreement, noting the 14 percent and 20 percent royalties payable under the first two agreements, respectively, but quoting the purchase price of the technology under the Purchase Option Agreement as $ 9,000,000. Only 12.5 Partnership Units eventually were sold (25 percent of the Units offered), and the purchase price under the Purchase Option Agreement was adjusted accordingly to $ 2,250,000 (25 percent of the $ 9,000,000). Although the Table of Contents of the Private Placement Memorandum listed "Projection of Revenue and Royalties" as a subheading, the text of the Private Placement Memorandum contained no such subsection. There were no profit projections, economic forecasts, market surveys, or appraisals contained in the Private Placement Memorandum other than a brief statement of the "potential return" based on York's exercise of its Purchase Option for $ 9,000,000. Approximately 22 of the 43 pages of the Private Placement Memorandum were devoted to a discussion of tax consequences, and a 62-page tax opinion comprised an exhibit to the Private Placement Memorandum. The tax discussion and opinion stated that any gain to the Partnership *389 pursuant to York's exercise of the Exclusive Option or Purchase Option was expected to qualify as long-term capital gain (noting the one-year period before such options were exercisable in addition to section 1235). On December 31, 1981, when the agreements between York and the Partnership were entered into, Mr. Beningson owned 18.9 percent of the stock of York, directly and through RRR. The Private Placement Memorandum noted the potential conflict of interest arising out of such stock ownership. In February 1982, Dr. Melmed resigned as President of York due to personal problems. He was placed in charge, however, of the research on the silver recovery process. Mr. Beningson replaced Dr. Melmed as Chairman of the Board of Directors, President, and Chief Executive Officer of York in February 1982. Mr. Beningson also purchased an additional 225,000 shares of York stock for $ 450,000, along with a warrant for another 225,000 of such shares, at such time. During the years in issue, York provided record-keeping services to the Partnership, including gathering and drawing checks on behalf of the Partnership, collecting amounts due from the limited partners in 1982, and preparing information *390 for the Partnership's outside accountants. On December 31, 1982, the following letter was sent from Mr. Michael Beckerich, Vice President and Chief Financial Officer of York, to Mr. Robert Beningson: Dear Bob: This is to advise the Partnership that the research and development contract between York Research Silver Technology Partnership and York Research has been concluded. Enclosed is a memo from Ken Melmed which summarizes the deliverables and other items. In addition, we hereby exercise an option for a non-exclusive license. Very truly yours, /s/ Michael P. Beckerich Vice President and Chief Financial Officer The letter was addressed to Mr. Beningson, President of RRR, at an address which was the same as that of York. Like Dr. Lyshkow, Mr. Beckerich was a former employee of CEA. On March 11, 1983, approximately 9 months before York's rights under the Exclusive Option Agreement were to become exercisable, York and the Partnership entered into an agreement entitled "Amended License Purchase Agreement" (the "Amended Agreement"). The Amended Agreement eliminated the one-year waiting period for exercise of the exclusive option and provided York with an immediate exclusive, worldwide, *391 and perpetual license of the silver recovery process in exchange for 300 shares of newly-authorized convertible $ 1,000 preferred stock of York. Each share of the preferred stock was convertible at the holder's option into 200 shares of York common stock. Except with respect to any shares that previously had been converted into common stock, York had the absolute right to redeem each share of the preferred stock for a price between $ 1,000 and $ 1,250 (depending on the year of redemption). [5] *392 Although Mr. Beningson was President, CEO, and Chairman of the Board of Directors of York at the time that the Amended Agreement was entered into, he signed such agreement on behalf of the Partnership (as President of RRR). In addition to substituting shares of York stock for royalty payments as consideration, the Amended Agreement deleted the requirement (contained in the Exclusive Option Agreement) that York use its best efforts to produce and market the silver recovery process. Notwithstanding the assumption agreements executed by the limited partners of the Partnership, the Partnership satisfied the 1986 payment due under the R&D Agreement by borrowing from another entity, using Partnership assets as collateral. As of the date of trial of the instant case (December 13, 1988), the payment due under the R&D Agreement in January 1987 had not been made by the Partnership. Petitioner Edward Maher was associated with the law firm of Townley and Updike between 1944 and 1985 and knew Mr. Beningson personally at the time that he invested in the Partnership, having worked on several securities offerings for CEA. In his decision to invest in the Partnership, Mr. Maher was influenced by Mr. Beningson's reputation as an "aggressive boy," but never spoke directly to Mr. Beningson *393 about the investment. In deducting his share of the Partnership's loss on his 1981 tax return, Mr. Maher relied upon the tax opinion of Townley and Updike (attached as an exhibit to the Private Placement Memorandum) and on the K-1 he received from the Partnership (which was prepared by Coopers and Lybrand). The Private Placement Memorandum warned potential investors that an Internal Revenue Service challenge to tax positions taken by the Partnership "may well be successful" and that "There is a high degree of risk that * * * the Partnership's treatment of its activities for tax purposes may not be sustained." Both the Private Placement Memorandum and accompanying tax opinion cautioned potential investors not to construe the contents thereof as legal or tax advice but to consult their own tax advisors. OPINION 1. Trade or Business Requirement of Section 174. Section 174(a) allows a deduction for "research or experimental expenditures" paid or incurred by a taxpayer during the taxable year "in connection with" the taxpayer's trade or business. Respondent concedes that York actually engaged in research and experimentation. It is respondent's contention, however, that the Partnership's *394 expenditures for such research and experimentation were not incurred in connection with a trade or business of the Partnership as required by section 174. The phrase "in connection with" a trade or business, as used in section 174, has been interpreted by the Supreme Court so as not to require current production or sales of the technology being developed. Snow v. Commissioner, 416 U.S. 500 (1974). In Green v. Commissioner, 83 T.C. 667 (1984), however, we clarified that if a taxpayer will never be in a position to produce or market such technology itself, the taxpayer is not entitled to deduct research and experimental expenditures under section 174. Green involved a partnership which entered into a research and development agreement and, on the same day, divested itself of all ownership rights in the technology to be developed under such agreement, by granting an exclusive, worldwide license of such technology to the research contractor for the patentable life of the technology. Under those circumstances, the partnership in Green was precluded from entering a trade or business involving the technology in question. We accordingly disallowed the section 174 deduction for the partnership's *395 research and development fee, characterizing the partnership as no more than an "investor" in the business activities of the research contractor. 83 T.C. at 688-689. See also Levin v. Commissioner, 87 T.C. 698 (1986), affd. 832 F.2d 403 (7th Cir. 1987). In situations such as that involved herein, in which a partnership does not divest itself immediately of all ownership rights in the technology to be developed under an R&D agreement (as in Green), but instead grants an option to the research contractor to acquire all of such rights, the test for deductibility under section 174 is whether there is a "realistic prospect" that the technology to be developed will be exploited in a trade or business of the partnership. Diamond v. Commissioner, 92 T.C. 423, 439 (1989) (on appeal, 4th Cir. October 16, 1989); Spellman v. Commissioner, 845 F.2d 148 (7th Cir. 1988), affg. T.C. Memo. 1986-403; Alexander v. Commissioner, T.C. Memo. 1990-141; Harris v. Commissioner, T.C. Memo. 1990-80; Everett v. Commissioner, T.C. Memo. 1990-65. Absent such a "realistic prospect," the section 174 deduction is disallowed for research and experimental expenditures of the partnership. Thus, mere legal "entitlement" *396 to enter a trade or business is not sufficient to satisfy the "trade or business" requirement of section 174. In assessing the partnership's prospects of entering into a trade or business involving exploitation of the technology, we evaluate the likelihood of exercise of the option granted by the partnership as well as other factors indicative of the partnership's intention or capability of entering such business. Diamond v. Commissioner, supra at 439, 441; Spellman v. Commissioner, supra at 150-151; Alexander v. Commissioner, supra; Harris v. Commissioner, supra; Everett v. Commissioner, supra.
In the instant case, respondent argues that the terms of the Non-Exclusive Option Agreement (which provided York with "most favored licensee" status), and the existence of the Exclusive Option and Purchase Option Agreements, rendered the Partnership's prospects of entering a trade or business involving the silver recovery process unrealistic. Respondent also notes the absence, in the Private Placement Memorandum, of plans for the exploitation of such technology by the Partnership and the focus of such document on York's options with respect to the technology. Respondent further argues that *397 the actions of the Partnership after 1981 confirm that the parties never intended the Partnership to commercially exploit the silver recovery process. Petitioners argue that it was highly unlikely that York would exercise the Exclusive Option and/or Purchase Option, characterizing the terms of such options as "too onerous for York." Petitioners also point to York's lack of experience in manufacturing and marketing, arguing that only the Partnership, through Mr. Beningson, had the experience and knowledge necessary to exploit the silver recovery process. We reject petitioners' arguments as unsupported by the objective facts in the record. The only "evidence" offered by petitioners in support of the allegedly onerous terms of the option agreements comes from the testimony of Mr. Beningson. Mr. Beningson testified that, despite his substantial ownership interest in York at the time that the agreements were entered into, he negotiated such agreements solely on behalf of the Partnership and as an adversary to York. He further testified that the royalty percentages under the Non-Exclusive Option and Exclusive Option Agreements were much higher than industry norms and that the 20 percent *398 royalty under the Exclusive Option Agreement would absorb any profit York might otherwise earn with respect to the technology. Regarding the Exclusive Option, Mr. Beningson stated: "I really didn't think anybody would ever exercise it at 20 percent royalty rate. They would either have to come back and negotiate with us." He also stated that: "It was the same as giving [York] the right to buy the moon. It wasn't going to happen," and described the options granted under the various agreements as "three options that effectively meant [York] could never own the product." Regarding the relative abilities of the Partnership and York to manufacture and market the technology, Mr. Beningson testified as follows: Q: In December 1981, as between the partnership and York Research Corporation, which entity was more likely in your view to be able to manufacture and market the results of the project? * * * A: Without a doubt, the partnership because that's where I was and that's where I had my incentives. Q: Well, what difference did it make that it was where you were? I don't understand that. A: Because of all the experience and background that I have which you've taken me through and because *399 of the lack of any experience or expertise or background of any of the people in York in doing the things that you are talking about.
Notably lacking from the evidence offered by petitioners is a satisfactory explanation of the inconsistency between Mr. Beningson's testimony -- that he imposed very onerous terms on York in the option agreements -- and Mr. Beningson's subsequent action in becoming the majority stockholder, President and CEO of York only two months later. If Mr. Beningson had in fact succeeded in negotiating contract terms that would effectively prevent York from retaining any profit on the exercise of the Exclusive Option, he would not have been expected to immediately purchase a majority of York's stock and become its President. [6] *400 Petitioners fail to explain how and why York did exercise the Non-Exclusive Option, in spite of its allegedly onerous terms and York's financial woes, and fail to offer any objective evidence that such terms were, in fact, onerous. We find Mr. Beningson's testimony about his negotiation with York unconvincing in light of his long-standing history of involvement with York. Mr. Beningson served as Chairman of the Board of Directors of York between 1969 and 1978, at which time the majority interest in York was sold to his first cousin, Dr. Melmed. In 1981, when York began experiencing financial difficulties, Mr. Beningson was asked to and did rejoin York's Board of Directors to aid York in finding new business opportunities. Mr. Beningson's testimony herein is, effectively, that he reinvolved himself with York in 1981 only to "steal" the idea he obtained there for the benefit of the Partnership. Mr. Beningson's testimony that only the Partnership had the experience and ability to market the silver recovery process (as of 1981) because of his own interest in the Partnership also strikes us as untenable in light of Mr. Beningson's significant, if not greater, interest in York as of such time. Petitioners' argument "attributing" Mr. Beningson's experience to the Partnership (to the exclusion of York) also ignores the fact that Mr. Beningson was not the general *401 partner of York. Rather, Mr. Beningson's personal holding company, RRR Ventures, a newly-formed investment corporation that also held interests in the Beningson family's antiquities business, served as general partner. Finally, we are unconvinced by the testimony offered by petitioners concerning Mr. Beningson's supervision of the research performed by York during 1982. By February 1982, Mr. Beningson was President, CEO, and Chairman of the Board of Directors of York. Petitioners' suggestion that he supervised York's progress on behalf of the Partnership has a hollow ring. Petitioners' argument that York was unlikely to acquire the silver recovery process because of the onerous terms of the option agreements is also weakened by an examination of what actually occurred. See Levin v. Commissioner, 832 F.2d 403, 406 n.3 (7th Cir. 1987), affg. 87 T.C. 698 (1986) (Tax Court was entitled to inquire whether subsequent events were consistent with its judgment of the facts available in the year in issue). More specifically, in March 1983, the Exclusive Option Agreement was amended so as to grant an exclusive and perpetual license to York in exchange for 300 shares of York preferred stock. *402 Such occurrence suggests that even if the original terms of the Exclusive Option Agreement were onerous, Mr. Beningson intended that such terms would be renegotiated to facilitate York's acquisition of the technology, a possibility suggested in his own testimony. As we stated in Harris v. Commissioner, T.C. Memo. 1990-80, in which the taxpayer similarly argued that the minimum royalty payable was so high as to preclude exercise of the option by the research contractor, "the amount of the royalties does not supply the required prospect of a 'trade or business' to be carried on by the Partnership." 58 T.C.M. 1441, 1451, 59 P-H Memo T.C. par. 90,080 at 371. Mr. Beningson explained the circumstances surrounding the amendment of the Exclusive Option Agreement: At having negotiated on behalf of the partnership this extremely rich license agreement with the contractor which in my view never would be exercised for a long period of time and would have probably either gone null and void or been renegotiate [sic], having since that time come into the position of being on the other side now. Now I was chief executive and a major investor in this contractor which held these options. Having the *403 problem that as I saw it, that the technology developed was good but maybe not great and that the inventors were coming up with new ideas that might be good and look like they might very well be great and that there was a gray area between the R&D work completed during 1982 and the R&D work that might be done going forward that might be even better, I had a real problem, in corporate opportunity, conflict of interest. I'm stuck on both sides. I couldn't take York on into that area leaving the partnership hanging with its rights. The royalty payments would have been too high. I wanted to develop the business that I had started out to develop. So, it seemed to me that the best way of resolving this and maximizing on the opportunity was to renegotiate the agreements and come up with a new measure of involvement in 1983 which would give the limited partners potentially a significant play, would allow York then to become the vehicle, since I was now York, whereas I hadn't been at the time we had done this, for commercializing this and allow me to use my talents in building the business now in York with the limited partners investing.
We find the above-quoted explanation -- that York's *404 role as marketer of the technology came about as a result of Mr. Beningson's new role with respect to York ("I was now York, whereas I hadn't been at the time we had done this") -- unconvincing and contradictory to Mr. Beningson's assertions concerning his actions during 1981. With respect to his role in negotiating the agreements executed in 1981, Mr. Beningson testified that his sole loyalty was to the Partnership, despite the conflict of interest present at that time. Mr. Beningson's explanation that he switched "sides" in 1982 and that such "switch" resulted in a transaction different from that originally contemplated, is also unconvincing. A scenario just as likely, in our view, is that Mr. Beningson came up with the idea of the Partnership as a financing vehicle for York, the company with which his loyalties rested and which would benefit from his experience in marketing if the research were successful. We also agree with respondent that the absence of plans in the Private Placement Memorandum for the Partnership's exploitation of the silver recovery process suggests that the likelihood of such activity was insignificant. Mr. Beningson admitted on direct examination that *405 the commercialization of the silver recovery process would require funds beyond those required to be contributed by the limited partners of the Partnership and suggested that such activity might be done by a new entity. The following testimony by Mr. Beningson is revealing: Q: But I don't understand what it was that the partnership was going to do after the R&D was completed? What was it going to do with this process? A: Have machines built for it. Put its name on it, I'd probably not manufacture ourselves, go out and market them in the field, have the chemicals packaged up with nice pretty bundles in an easy way to use and go sell those to the potential users. Possibly license other people to use it or if not build its own refineries. It depended on the success of the project. * * * Q: And how were these activities to be financed? A: Well, it would depend on the situation at the time. Venture capital is very much available. I could have perhaps gone back to the original partner, brought in additional partners, set up a subsidiary and go public. You know. There are many ways. Go to a bank and borrow the money * * * Who knows. [Emphasis supplied.] The lack of specific plans *406 or known sources of funds for the Partnership's own marketing of the silver recovery process, revealed in Mr. Beningson's remarks, stands in contrast to the existence of prenegotiated contracts related to York's marketing of the technology. Such contrast suggests that the latter possibility was the one contemplated to occur in 1981. In sum, the contents of the Private Placement are inconsistent with Mr. Beningson's assertion that the options granted to York were as unlikely to be exercised as a "right to buy the moon." Petitioners bear the burden of proving that the requirements of section 174 have been met. Rule 142(a). In the instant case, petitioners have failed to convince us that there was a "realistic prospect," during the years in issue, that the silver recovery process would be exploited in a trade or business of the Partnership. In that regard, we note that, assuming that the Partnership was the beneficial owner of the silver recovery process during the years in issue, the transfer of such technology to York did not in itself amount to a trade or business. The terms of the Non-Exclusive License Agreement (which granted most-favored licensee status to York) and the existence *407 of the Exclusive Agreement and Purchase Option Agreement, moreover, negated any "realistic prospect" that the Partnership would engage in regular licensing of the silver recovery process to entities other than York. Green v. Commissioner, 83 T.C. 667, 689 (1984);Alexander v. Commissioner, T.C. Memo. 1990-141;Harris v. Commissioner, supra. Accordingly, respondent's disallowance of the deductions claimed under section 174 is sustained. As discussed below in connection with the Partnership's miscellaneous deductions, we further find that petitioners have failed to establish that the Partnership's activities were entered into or engaged in for profit within the meaning of section 183. Profit objective is a prerequisite to deductibility of research and experimental expenditures under section 174. Drobny v. Commissioner, 86 T.C. 1326, 1340 (1986);Moore v. Commissioner, T.C. Memo. 1989-38, 56 T.C.M. 1150, 1153, 58 P-H Memo T.C. par. 89,038 at 177. Accordingly, respondent's disallowance of the Partnership's deductions for amounts payable under the R&D Agreement is alternatively sustained on the basis of lack of profit objective.
2. Deductibility of Miscellaneous Expenses. In addition *408 to deducting their distributive shares of the amount payable under the R&D Agreement, petitioners also deducted their shares of the following items: 1981
Management fee to RRR
$ 12,500
Amortization of consulting fee
117
Inventor fees
1,000
Legal fees
10,667
1982
Commission expenses
$  1,200
Accounting fees
2,975
Bank charges
26
Amortization of consulting fee
1,400
Management fee
15
General and administrative
2,642
In his opening brief, respondent alleged various grounds for disallowance of the foregoing deductions, including failure to adequately substantiate certain deductions, failure to meet the requirements of section 162, 212, or 195, disallowance of current deductions for capital expenditures under section 263, and nondeductibility of organization and syndication expenses under section 709(a). In their reply brief, petitioners argue that respondent has attempted to raise, on brief, new grounds for disallowance of the miscellaneous deductions. In that regard, petitioners focus on respondent's trial memorandum, arguing that, based on such trial memorandum, they believed respondent's position to involve only sections 183 and 465. [7] *409 Assuming without deciding that the only provisions in issue with respect to the miscellaneous deductions are sections 183 and 465, we nevertheless agree with respondent that the limitations of section 183 are applicable herein, as petitioners have failed to establish that the Partnership's activities were engaged in for profit within the meaning of such provision. We note that the objective of the Partnership in the instant case must be distinguished from the objectives of York in entering into the disputed transaction. In the case of a partnership, the determination of whether an activity is engaged in for profit is made at the partnership level. Brannen v. Commissioner, 78 T.C. 471, 504-505 (1982), affd. 722 F.2d 695 (11th Cir. 1984). In order for an activity to be treated *410 as engaged in for profit, it must be entered into with an "actual and honest profit objective." Levy v. Commissioner, 91 T.C. 838, 871 (1988).In that regard, the Second Circuit, to which the instant case is appealable, has stated that the taxpayer must "represent and demonstrate that he expected to receive a profit from the transaction, apart from the value of or benefits obtained from the tax deductions." Estate of Baron v. Commissioner, 798 F.2d 65, 72 (2d Cir. 1986), affg. 83 T.C. 542 (1984).[8] *411 The issue of whether the requisite profit objective exists is one of fact to be resolved on the basis of all of the evidence. Greater weight must be given, however, to objective facts than to the parties' mere statements of intent. Surloff v. Commissioner, 81 T.C. 210, 239 (1983). In the case of a limited partnership, it is appropriate to focus on the activities and intent of the general partners and promoters of the partnership in making a determination as to profit objective. Hulter v. Commissioner, 91 T.C. 371, 393 (1988).
The absence of profit projections in promotional materials sent to investors in a partnership suggests the lack of a profit objective. See West v. Commissioner, 88 T.C. 152, 160 (1987);Drobny v. Commissioner, supra at 1347; Capek v. Commissioner , 86 T.C. 14, 38 (1986) ("conspicuous absence" of profit projections in offering booklets); Independent Electric Supply, Inc. v. Commissioner, 781 F.2d 724, 727 (9th Cir. 1986), affg.T.C. Memo. 1984-472 (promotional materials for patent trusts contained little or no substantive information on economic viability of the patents to be exploited). In the instant case, the Private Placement Memorandum contained no profit projections aside from a brief reference to potential return based on the exercise of the Purchase *412 Option. [9] Moreover, there was no description in the Private Placement Memorandum of the potential users or market for the desired end-product of York's research efforts. The absence of projections in the Private Placement Memorandum was rendered even more obvious in the instant case by the reference to projections erroneously included in the table of contents for the Private Placement Memorandum. Mr. Beningson testified that such reference may have been left in by accident by the lawyers who drafted the document. Focusing on the actions of Mr. Beningson as an indicator of the Partnership's motives, petitioners also have failed to present any evidence that Mr. Beningson *413 attempted to obtain projections of the profitability of the silver recovery process before committing the Partnership to expend $ 592,000 with respect to its development. We find Mr. Beningson's explanation for the absence of projections -- i.e., the inherently speculative nature of the Partnership's venture -- insufficient to overcome the inference of a lack of profit objective arising from such absence. Mr. Beningson admitted that projections could have been obtained. As we stated in Drobny v. Commissioner, supra, which also involved a partnership's deductions for research and experimental expenditures: Finally, the absence of any marketing projections or estimates of revenues from goods sold is one further indication that the programs had no profit objective. As the petitioners properly point out, sales estimates for new products may not be very reliable. However, the absence of any effort to ascertain whether the investors would receive a return on their * * * investment indicates they were purchasing tax benefits. [86 T.C. at 1347-1348] [Emphasis supplied.]
The absence of profit projections or information about the market for the silver recovery process in the Private Placement *414 Memorandum contrasts with the extensive discussion of tax benefits and other tax information included therein. Other facts in the record also suggest an absence of profit objective on the part of the Partnership. Section 1.183-2(b)(1), Income Tax Regs., states that one factor to be considered in deciding whether a profit objective exists is the manner in which the taxpayer carries on its activity -- i.e., whether the activity is carried on in a "businesslike" manner. In the instant case, the testimony of Mr. Beningson, promotor of the Partnership and sole stockholder of its general partner, paints an "unbusinesslike" picture. While Mr. Beningson testified that he intended that the Partnership would be the entity to commercialize the silver recovery process, his approach with respect to obtaining the capital needed for such commercialization was summed up in his testimony with the comment "who knows." The circumstances surrounding the execution of the Amended Agreement also strike us as inconsistent with businesslike conduct or focus on Partnership profit. In his testimony concerning such circumstances, Mr. Beningson first described the Exclusive Option Agreement as an "extremely *415 rich license agreement." He went on to explain that he basically had renegotiated the agreement to avoid his own conflict of interest dilemma. In the process of such renegotiation, the Partnership lost all rights to exploit the silver recovery process on its own and also parted with any hope of obtaining the "extremely rich" royalties provided for under the Exclusive Option Agreement. While Mr. Beningson described the York stock received under the Amended Agreement as giving the limited partners "potentially a significant play," the value of such preferred stock at the time the Amended Agreement was entered into was, according to his testimony, only $ 300,000. The redemption provisions applicable to the preferred stock under the Amended Agreement also indicate that such agreement was entered into without regard to its impact on Partnership profitability. Specifically, under the Amended Agreement, the 300 shares of preferred stock were redeemable in the discretion of the York Board of Directors for amounts between $ 300,000 and $ 375,000 (depending on the year of redemption) as compared with the $ 592,000 fee called for under the R&D Agreement. Assuming no prior conversion to common *416 stock or payment of dividends on the preferred, such redemption would have assured that the Partnership suffer a net loss as a result of the disputed transactions. In short, we are left to conclude that, by the time the Amended Agreement was executed, the Partnership already had obtained its "objective" in its dealings with York -- namely, an immediate deduction for the entire R&D fee. [10]
Another factor generally indicative of a lack of profit objective is the payment of "inflated purchase prices," the amount of which is unrelated to economic considerations. See Independent Electric Supply, Inc. v. Commissioner, supra at 728. In the instant case, the R&D fee payable to York was analogous to a "purchase price" and generated the major tax benefit involved herein. Petitioners have failed to convince us that the amount of such fee was determined through arm's-length negotiations or was related *417 to the fair market value of the research to be performed by York. [11] Mr. Beningson's testimony in that regard was confusing and contradictory. At one point, Mr. Beningson testified that the amount of the R&D fee was related to the number of Partnership Units sold, but was negotiated to account for broader or narrower scopes of research activity depending on the funds available. At another point, however, Mr. Beningson testified that the price of the Units was determined after the number of investors was known, by dividing a predetermined R&D fee by the number of investors. The latter assertion is directly contradicted by the Private Placement Memorandum, which fixed the price of the Partnership Units before any Units were sold and stated on its cover that the R&D fee would be "adjusted proportionately" if less than the 50 Units offered were sold. In short, we are not convinced the amount of the fee payable to York was related to the quantity or character of the research to be performed rather than simply to the number of Partnership Units sold. The deferred nature of a majority of the R&D fee also suggests that such fee was negotiated with greater focus on tax than on economic *418 concerns. As we stated in Smith v. Commissioner, 91 T.C. 733, 762 (1988): By its nature, research and development should be funded as quickly as possible so that the research can be completed and the results put into operation. * * * A binding agreement to pay substantial and fixed amounts far in the future without regard to the success of this venture simply does not make sense from a business standpoint. Inadequate current funding would guarantee failure. This structure of financing, therefore, constitutes evidence that the activity was not carried on in a businesslike fashion. [Emphasis supplied; fn. ref. omitted.] Finally, the amount of the R&D fee -- $ 592,000 -- does not square with the $ 1,000 "purchase price" paid by the Partnership (two days before the R&D Agreement was signed) for the stated purpose of acquiring all rights to the then-existing technology. [12] *419 Sections 1.183-2(b)(2) and (b)(3), Income Tax Regs., state that the expertise of the taxpayer and the time and effort expended by the taxpayer in carrying on the activity are other factors to be taken into account in evaluating profit objective. In the instant case, the general partner of the Partnership was RRR, a personal holding company formed only days before the closing between the Partnership and York. The Private Placement Memorandum, moreover, warned investors that RRR was engaged in business activities other than the Partnership and would spend only such time as it deemed necessary in Partnership affairs. We find that the general partner's lack of experience in the "trade or business" activity in which the Partnership allegedly was to engage, and the limited amount of time which the general *420 partner would devote to such activity, weighs against a finding of profit objective in the instant case. As noted above in connection with section 174, we reject petitioners' attempt to attribute the marketing experience of Mr. Beningson to the Partnership. We also note that the Partnership had no employees during the years in issue. We have considered all of the other arguments raised by petitioners and find them without merit. For the foregoing reasons, we find that petitioners have failed to establish that the Partnership was engaged in an activity for profit within the meaning of section 183. Accordingly, the Partnership's deductions for miscellaneous expenses are allowable only to the extent permitted under section 183. [13]
3. Additions to Tax for Negligence
Respondent determined additions to tax for negligence under section 6653(a) against petitioners Edward and Margaret Maher for the year 1981. Petitioners bear the burden of proving the incorrectness of such *421 determination. Rule 142(a). Negligence is defined as a lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 937 (1985).In support of their position that petitioners Edward and Margaret Maher were not negligent, petitioners point to Mr. Maher's reliance on (1) the "62-page tax opinion" prepared by the law firm of Townley and Updike (of which he was a partner), (2) the Schedule K-1 to Form 1065 he received for the year 1981, and (3) Mr. Beningson's reputation as a good businessman. We find such reliance insufficient to satisfy petitioner's burden of proof. Although reliance on the advice of professionals may defeat a finding of negligence under certain circumstances, Mr. Maher's reliance on the tax opinion attached to the Private Placement Memorandum is not "the type of reliance" contemplated by that rule. See Patin v. Commissioner, 88 T.C. 1086, 1130 (1987), affd. without published opinion sub nom. Hatheway v. Commissioner, 856 F.2d 186 (4th Cir. 1988), affd. sub nom. Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), affd. without published opinion 865 F.2d 1264 (5th Cir. 1989), *422 affd. sub nom. Gomberg v. Commissioner, 868 F.2d 865 (6th Cir. 1989). See also Rybak v. Commissioner, 91 T.C. 524, 565-566 (1988).The content of the tax opinion allegedly relied upon by Mr. Maher should also have alerted him as to the necessity of seeking independent advice on the availability of the promised tax benefits. Marine v. Commissioner , 92 T.C. 958, 993 (1989); McCrary v. Commissioner, 92 T.C. 827, 850 (1989). Mr. Maher reasonably should have heeded the warnings in the Private Placement Memorandum and tax opinion to not construe such documents as advice. We have repeatedly found reliance on offering materials insufficient to defeat a finding of negligence. Marine v. Commissioner, supra at 992-993; McCrary v. Commissioner, supra; Patin v. Commissioner, supra.
Petitioners' contention concerning Mr. Maher's reliance upon the K-1 prepared by Coopers and Lybrand is without merit in that no showing has been made that the accounting firm evaluated the merits of the claimed deductions rather than simply preparing the tax return based on information supplied by the Partnership. We also find no merit in Mr. Maher's alleged reliance on the business reputation of Mr. Beningson. *423 Cf. Rybak v. Commissioner, supra at 565.Mr. Maher's own testimony describing Mr. Beningson as "an aggressive boy" suggests that he should have given more scrutiny to the propriety of the promised tax benefits. Accordingly, we sustain respondent's determination of additions to tax for negligence against petitioners Edward and Margaret Maher. 4. Increased Interest Under Section 6621(c)
Having found that the Partnership's activities were not engaged in for profit under section 183, the increased rate of interest provided by section 6621(c) applies with respect to the disallowed losses of the Partnership for the year 1981. [14] Section 301.6621-2T, Q4 and A4, Proced. and Admin. Regs.; Patin v. Commissioner, supra at 1129; Rose v. Commissioner, 88 T.C. 386, 427 (1987), affd. 868 F.2d 851 (6th Cir. 1989); Moore v. Commissioner, T.C. Memo. 1989-38.[15] *424 In light of our holdings above, we need not address respondent's argument that petitioners were not "at risk" under section 465 with respect to their proportionate shares of the promissory notes issued by the Partnership to York. To reflect the foregoing, Decisions will be entered under Rule 155.
Footnotes
1. The cases consolidated herein are collectively referred to as "the instant case."↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code, as amended and in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
*. plus increased interest under section 6621(c)↩
**. plus 50 percent of the interest payable on the portion of the underpayment due to negligence↩
3. Under the Exclusive Option Agreement, the Partnership represented that it had executed no other agreement in conflict therewith.↩
4. The only mention of such activities came under the heading "Application of Cash Receipts," in which it was stated that cash receipts of the Partnership could be applied "To acquire for leasing or sale any of the machinery or equipment designed and developed by the Contractor pursuant to the R&D Agreement," but only after the payment of all Partnership obligations and expenses and the establishment of reasonable reserves.↩
5. Section 3(c) of the Amended Agreement provided that the preferred stock was redeemable by York at the following prices per share during the 12 month period beginning March 31 of the years indicated: Year
Redemption Price
1983
$ 1,250
1984
1,250
1985
1,200
1986
1,200
1987
1,150
1988
1,150
1989
1,100
1990
1,100
1991
1,050
1992
1,050
1993 and thereafter
1,000
The preferred stock was entitled to biannual dividends (when and as declared by the York Board of Directors out of available funds) commencing March 31, 1985, at the rate of 20 troy ounces of fine silver (99.9 percent purity) payable in silver, in its cash equivalent, or in common stock of York. The value of any declared but unpaid dividends was to be added to the above-stated redemption prices.
6. Mr. Beningson's only apparent attempt to reconcile such circumstances was his testimony that he took over the management of York after Dr. Melmed's resignation because of his concern over the future of the R&D Agreement (presumably from the Partnership's perspective).
7. The Explanation of Adjustments in the notice of deficiency issued to petitioner Coleman stated as the reason for disallowance that petitioner had failed to establish entitlement to "any portion of the loss claimed under any provision of the Internal Revenue Code." The Explanation of Adjustments in the notice of deficiency issued to petitioners Maher stated that the Partnership was not an activity engaged in for profit and also noted various other grounds for disallowance.
8. In Estate of Baron v. Commissioner, 798 F.2d 65, 72 (2d Cir. 1986), the Second Circuit found it unnecessary to comment on "the precise extent to which a transaction must be profit-motivated" for a taxpayer to be entitled to tax benefits therefrom. The taxpayer in Estate of Baron had failed to demonstrate "any reasonable expectation" of profit, rendering further consideration of the "quantity" of profit objective required to fall outside section 183 unnecessary. 798 F.2d at 72. In the Tax Court, the requisite profit objective is "actual and honest." Levy v. Commissioner, 91 T.C. 838, 871↩ (1988).
9. The following testimony of Mr. Beningson is particularly illustrative: Q: Mr. Beningson, I want you to look further at [the Private Placement Memorandum]. Were any projections of revenues and royalties done as to the success of the R&D that would be done? A: No. The people invested primarily in their knowledge or what they had heard about me and what I would do and then the fact that I took a big piece of the back end and a small piece of the front end so they figured I was deeply -- going to be deeply involved.↩
10. We recognize that the Amended Agreement was entered into subsequent to the years in issue herein, but find that such subsequent action is consistent with our view as to the Partnership's objectives during the years in issue. See Levin v. Commissioner, 832 F.2d 403, 406↩ n. 3 (7th Cir. 1987).
11. The R&D Agreement only required that York use its "best efforts" in performing the designated research tasks.↩
12. Notwithstanding Mr. Beningson's testimony that a one-year term for the research engagement was selected because creative ideas occur fairly quickly, the tax aspects discussion in the Private Placement Memorandum suggests that the one-year term may have been selected with a view toward avoiding disallowance of deductions on the grounds of "material distortion of income." See section 446. Moreover, despite the fact that the R&D Agreement technically terminated after one year, Dr. Melmed, on behalf of York, continued his research on the silver recovery process for several additional years.
13. Petitioners have not shown that any of the miscellaneous expenses are allowable as deductions irrespective of profit objective. Section 183(b)(1). A deduction of $ 485 is allowable for 1982 under section 183(b)(2).↩
14. A motion by respondent to amend his answer so as to assert the increased rate of interest against petitioner Jerome Coleman was originally denied. The denial of respondent's motion will be vacated, and the motion will be granted. The increased rate of interest thus applies with respect to all petitioners herein.↩
15. Prior to the Tax Reform Act of 1986, subsec. (c) of section 6621 was designated subsec. (d). Sec. 1511(a), Pub. L. 99-514, 100 Stat. 2085, 2744. The additional interest provided thereunder applies after December 31, 1984, even with respect to transactions entered into prior to that date. Solowiejczyk v. Commissioner, 85 T.C. 552 (1985), affd. without published opinion 795 F.2d 1005↩ (2d Cir. 1986).